MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2020 ME 34
Docket:       PUC-19-182
Argued:       December 6, 2019
Decided:      March 17, 2020

Panel:        SAUFLEY, C.J., and GORMAN, JABAR, HUMPHREY, and HJELM, JJ.*

NEXTERA ENERGY RESOURCES, LLC

v.

MAINE PUBLIC UTILITIES COMMISSION et al.

JABAR, J.

[¶1]  NextEra Energy Resources, LLC, appeals from an order of the Maine Public Utilities Commission granting Central Maine Power Company's (CMP) petition for a certificate of public convenience and necessity (CPCN) for the construction and operation of the New England Clean Energy Connect (NECEC) project.  The NECEC project is a 145.3-mile transmission line, proposed to run from the Maine-Québec border in Beattie Township to Lewiston, that will deliver 1,200 megawatts of electricity from Québec to the New England Control

---

*  Justice Hjelm sat at oral argument and participated in the initial conference while he was a Justice, and, on order of the Chief Justice, was authorized to continue his participation in his capacity as an Active Retired Justice.

Justice Mead sat at oral argument and participated in the Court's initial conference regarding this opinion immediately following the oral argument but did not participate further in the development of the opinion.

2

Area. We discern no error in the Commission's determination that the NECEC project meets the applicable statutory standards for a CPCN or in its decision to approve the stipulation. We affirm the decision of the Maine Public Utilities Commission.

## I. BACKGROUND

[¶2] Pursuant to an enactment of the Massachusetts Legislature in 2008, every distribution company within Massachusetts was required to solicit and enter into cost-effective long-term contracts for clean-energy generation. In response to the Massachusetts electric distribution companies' and Massachusetts Department of Energy Resources' request for proposals seeking bids for clean energy, CMP and Hydro Renewable Energy Inc., a U.S. affiliate of Hydro-Québec,[1] submitted a joint bid for the NECEC project.

[¶3] On September 27, 2017, in anticipation of Massachusetts's January 25, 2018, deadline to select the winning bid, CMP filed a petition with the Commission for a CPCN for the NECEC project. *See* 35-A M.R.S. § 3132 (2018); 65-407 C.M.R. ch. 330 (2012). The petition described the NECEC project as "a high voltage direct current (HVDC) transmission solution capable

---

[1] Hydro-Québec subsequently transferred its interest in the project to H.Q. Energy Services (U.S.) Inc. (HQUS), one of its existing U.S. affiliates. As Hydro Renewable Energy Inc.'s successor, HQUS serves as the counterparty for contractual arrangements underlying the NECEC project.

of delivering 1,200 [megawatts] of electricity from Québec to the New England Control Area." CMP asserted in its petition that the NECEC would "be developed, constructed and operated by CMP in Maine at *no cost* to Maine electricity customers."

[¶4] Upon receiving the petition, the Commission's hearing examiners[2] issued a "Notice of Proceeding" to provide all interested persons with the opportunity to file petitions for intervention by October 13, 2017. The examiners granted seven timely-filed petitions to intervene, including those filed by the appellees in this matter, the Office of the Public Advocate and the Industrial Energy Consumer Group.[3]

[¶5] In February 2018, after the Commission proceeding was a few months underway, CMP was notified that the NECEC project had been selected as the winning bid.[4] Shortly thereafter, the Commission received many

---

[2] Hearing examiners are Commission staff assigned to oversee a case. Two examiners were assigned to this proceeding.

[3] The Conservation Law Foundation, Dorothy Kelly, the Maine Renewable Energy Association, the Natural Resources Council of Maine, and Western Mountains and Rivers Corporation also timely filed petitions to intervene.

[4] The NECEC was originally selected as the alternate winning bid, but became the winning bid after a necessary siting permit for the original winning bid, an all-hydroelectric bid, was denied in New Hampshire.

4

late-filed petitions to intervene.[5] NextEra filed its petition to intervene in March 2018, asserting that it may be substantially and directly affected by the proceeding because it indirectly owns three existing energy stations in Maine, as well as a number of wind, solar, and storage projects under development in the state. Notwithstanding NextEra's late filing, the examiners agreed that NextEra would be substantially and directly affected by the outcome of the proceeding and therefore granted NextEra discretionary intervenor status.

[¶6] The volume of data requests and testimony filed by over twenty intervenors was substantial, leading the examiners to schedule additional conferences and rebuttal phases to the proceeding. Technical conferences continued through the summer of 2018 into the fall. CMP and NextEra both presented expert testimony. Throughout the course of the proceeding, the Commission held three public witness hearings and received over 1,350 public comments.[6]

---

[5] In addition to NextEra, the following parties submitted late-filed petitions to intervene: the Governor's Energy Office; RENEW Northeast, Inc.; Calpine Corporation, Vistra Energy Corporation, and Bucksport Generation, LLC (collectively, the generator intervenors); the Acadia Center; Friends of Maine Mountains; ReEnergy Biomass Operations LLC; International Brotherhood of Electrical Workers Local Union 104; City of Lewiston; Town of Caratunk; Maine Chamber of Commerce; Town of Farmington; Greater Franklin Development Council; Trout Unlimited; Former Senator Thomas Saviello; Darryl Wood; Town of Alna; Town of Wilton; Town of New Sharon; Old Canada Road National Scenic Byway, Inc.; Town of Jackman; and Terry Brann. All petitions were granted on either a mandatory or discretionary basis.

[6] Public witness hearings were held in Farmington and the Forks Plantation in September 2018. An additional public witness hearing was held in the Commission's Hallowell hearing room in

[¶7]    Six evidentiary hearings were held in October 2018 and January 2019,[7] following which the parties briefed specific questions posed by the examiners.

[¶8]  As the proceeding progressed, a number of the parties—including CMP—engaged in negotiations and ultimately reached a stipulation.[8]  *See* 65-407 C.M.R. ch. 110, § 8(D) (2012).  The stipulation was joined by eleven parties, including CMP, the Office of the Public Advocate, and the Industrial Energy Consumer Group.  *See infra* ¶ 39.  The thirty-eight-page stipulation required the project to provide myriad benefits to ratepayers and the State as conditions to the recommended Commission approval of the stipulated findings and issuance of the CPCN.[9]  The stipulating parties agreed that a "public

---

October 2018.  The majority of the public comments the Commission received were in opposition to the NECEC project—largely raising environmental, scenic, and tourism-related concerns.

[7]  On October 21, 2018, NextEra filed a motion to suspend the hearings due to CMP's failure to produce documents as ordered.  The examiners granted NextEra's motion on October 26, thereby canceling the next three scheduled hearings.

[8]  In accordance with the Commission's rules, "[t]he Commission may dispose of all or part of any adjudicatory proceeding by approving a stipulation of one or more issues entered into between two or more parties."  65-407 C.M.R. ch. 110, § 8(D) (2012).  A stipulation is an agreement reached by parties through settlement negotiations in the course of commission proceedings.  *See generally* 65-407 C.M.R. ch. 110, § 8 (2012).

[9]  In terms of economic benefits, the stipulation provides for more than $140 million in ratepayer benefits, $50 million in benefits for low income customers, and over $57 million in community and state-wide benefits—totaling almost $250 million of additional financial benefits for Maine.  With the exception of certain transmission rate credits, education grant funding, and funding for electric vehicle rebates, these funding commitments are conditioned on the NECEC achieving commercial operation.

need" exists for the NECEC project and that construction of the NECEC project is in the public interest. A hearing on the stipulation was held on March 7, 2019.

[¶9] On March 29, 2019, the hearing examiners issued a 162-page report containing their recommendations. The examiners concluded that, independent of the stipulation, the NECEC meets the applicable statutory standards for a CPCN, and they recommended approval of CMP's Petition. Although not necessary to their finding of public need, the examiners determined that the beneficial provisions described in the stipulation augmented the project's benefits and likewise recommended approval of the stipulation. A number of parties, including NextEra, filed comments and exceptions to the hearing examiners' report.

[¶10] In the 100-page order dated May 3, 2019, the Commission adopted the recommendations and findings of the examiners' report and concluded, *inter alia*, that (1) the NECEC project meets the statutory public need standard and is in the public interest; and (2) the stipulation satisfies the approval criteria set forth in the Commission's rules. The commissioners unanimously voted to grant CMP a certificate of public convenience and necessity for the

construction and operation—all at no cost to Maine electricity customers—of the New England Clean Energy Connect Project.[10]

[¶11] NextEra timely appealed. *See* 35-A M.R.S. § 1320 (2018); M.R. App. P. 2B.

## II. DISCUSSION

[¶12] In this appeal, NextEra claims that the Commission (1) erred by failing to require CMP to file the results of an independent investigation regarding the use of nontransmission alternatives; (2) erred in its construction and application of 35-A M.R.S. § 3132(6) (2018); and (3) abused its discretion in approving the stipulation. Before we address these arguments, we address the preliminary matter of whether NextEra has standing to appeal the Commission's order.

A.    NextEra's Standing to Appeal

[¶13] The Industrial Energy Consumer Group contends that NextEra lacks standing to bring this appeal.[11] "The right to appeal from an administrative decision is governed by statute. Whether a party has standing

---

[10] One of the commissioners filed a separate opinion but joined in the outcome.

[11] NextEra contends that this argument was not preserved. However, standing is "an issue cognizable at any stage of a legal proceeding," including on appeal. *Bank of America, N.A. v. Greenleaf*, 2015 ME 127, ¶ 8, 124 A.3d 1122.

8

depends on the wording of the specific statute involved." *Nelson v. Bayroot, LLC*, 2008 ME 91, ¶ 9, 953 A.2d 378 (citation omitted).

[¶14]  Section 1320 governs this Court's review of Commission action and grants statutory standing to appeal to "[a]ny person who has participated in commission proceedings, and who is adversely affected by the final decision of the commission."  35-A M.R.S. § 1320(2) (2018).  There is no question that NextEra participated in the commission proceedings; therefore, the only issue in dispute is whether NextEra is "adversely affected" by the order granting CMP's petition for the NECEC project.  *See id.*

[¶15]  NextEra contends that the order adversely affects its Maine-based wind and solar affiliates in a number of ways.  While recognizing that the Commission found "little merit" to *some* of these concerns, we are nonetheless satisfied that NextEra is adversely affected by the Commission's decision in other ways and therefore satisfies section 1320's standing requirements.  *See id.*

B.    Nontransmission Alternatives

[¶16]   NextEra contends that the Commission failed to follow the statutory mandates of 35-A M.R.S. § 3132(2-C)(C) (2016),[12] which

_____

[12]  The Commission applied 35-A M.R.S. § 3132(2-D) (2018), the provision addressing NTA investigations that was in effect at the time of the order, instead of 35-A M.R.S. § 3132(2-C)(C) (2016),

unambiguously mandated that CMP include in its petition the results of an independent third-party investigation into the use of nontransmission alternatives (NTAs). NextEra contends that, because the statute does not expressly authorize the Commission to relieve CMP from that mandatory requirement, CMP's failure to submit the results of a third-party NTA investigation is fatal to its petition.

[¶17] In its order, the Commission concluded that "because there is no NTA that can feasibly substitute for the NECEC, the statute does not require that an independent analysis of the costs of potential NTAs be conducted." The Commission stated that an NTA could not meet the public need at a lower cost because there will be *no* cost to Maine customers for the proposed project. The Commission, citing *Town of Madison v. Public Utilities Commission*, 682 A.2d 231, 234 (Me. 1996), concluded that, despite the plain language of the statute requiring an NTA investigation, strictly adhering to the statute in this case would lead to "absurd results."

[¶18] The Commission's conclusion that requiring an NTA investigation, apparently mandatory under the statute, would be absurd and illogical does not

---

*repealed by* P.L. 2017, ch. 201, § 3 (effective Nov. 1, 2017), which was in effect at the time CMP filed its petition. We agree with NextEra that § 3132(2-C)(C) (2016) was the appropriate statute for the Commission to have applied. *See Terry v. St. Regis Paper Co.,* 459 A.2d 1106, 1109 (Me. 1983).

constitute error. The plain language of section 3132(2-C)(C) mandates a comparison of the transmission line's total projected costs with the total projected costs of the alternatives. 35-A M.R.S. § 3132(2-C)(C) (2016), *repealed by* P.L. 2017, ch. 201, § 3 (effective Nov. 1, 2017). Additionally, 35-A M.R.S. § 3132(6) requires an analysis to explore less costly alternatives to the proposed transmission line. Because this proposed transmission line will be constructed at *no* cost to Maine ratepayers, however, there is no logical reason to undertake such a comparative cost analysis. In *Trask v. Public Utilities Commission*, we stated that the plain meaning is only applied "so long as it does not lead to an absurd, illogical, or inconsistent result." 1999 ME 93, ¶ 7, 731 A.2d 430 (quotation marks omitted). Here, the Commission reasonably determined that reading the statute to require the undertaking and consideration of a futile investigation into lower-cost NTAs would lead to an absurd and illogical result.

[¶19] The Commission did not commit legal error when it decided that, in the context of this unique proceeding, CMP was not required to file the results of a third-party investigation into nontransmission alternatives.

C.     Public Need Standard

[¶20]   Next, NextEra contends that the Commission misconstrued the plain and unambiguous language of 35-A M.R.S. § 3132 and failed to comply with the statutory scheme, including the statute's mandate directing the Commission to identify a public need for the NECEC project.  Because NextEra is the party challenging the Commission's decision, it has "the burden of showing that the [Commission]'s action was arbitrary or based on an error of law."  *Cent. Maine Power Co. v. Pub. Utils. Comm'n*, 2014 ME 56, ¶ 19, 90 A.3d 451 (quotation marks omitted).

[¶21] Section 3132(6) requires the Commission to make specific findings regarding the "public need" for a proposed transmission line, but the statute does not define "public need."[13]

1.     Interpreting "Public Need"

[¶22]   We apply a two-part inquiry "[w]hen reviewing an agency's interpretation of a statute that is both administered by the agency and within the agency's expertise."  *Competitive Energy Servs. LLC v. Pub. Utils. Comm'n*,

---

[13]  NextEra also asserts that the Commission failed to identify a public need for a certain number of megawatts of energy, not contracted for, that the NECEC is capable of delivering.  Because the statute requires a determination of public need only for the transmission line itself, and not for its particular capacity, we find this argument to be unpersuasive and do not address it further.

2003 ME 12, ¶ 15, 818 A.2d 1039. First, we determine de novo whether the statute is ambiguous. *Id.* Next, if the statute is unambiguous we apply its plain meaning, but if it is ambiguous we "review the Commission's construction of the ambiguous statute for reasonableness." *Id.* "Statutory language is considered ambiguous if it is reasonably susceptible to different interpretations." *Scamman v. Shaw's Supermarkets, Inc.*, 2017 ME 41, ¶ 14, 157 A.3d 223 (quotation marks omitted).

[¶23]  Section 3132 provides, in part, that "a person may not construct any transmission line . . . unless the commission has issued a certificate of public convenience and necessity approving construction."  Pursuant to section 3132(6), "the commission shall make specific findings with regard to the public need for the proposed transmission line. . . .  [I]f the commission finds that a public need exists, after considering whether the need can be economically and reliably met using nontransmission alternatives, it *shall* issue a certificate of public convenience and necessity for the transmission line." (Emphasis added.) Although section 3132(6) does not define "public need," it does at least provide factors for the Commission to consider to determine public need:

> In determining public need, the commission shall, at a minimum, take into account economics, reliability, public health and safety, scenic, historic and recreational values, state renewable energy generation goals, the proximity of the proposed transmission line

to inhabited dwellings and alternatives to construction of the transmission line, including energy conservation, distributed generation or load management.

[¶24]    Furthermore, the Commission rules *do* define "public need." Chapter 330 of those rules establishes filing requirements pursuant to section 3132, and section 9(A) of Chapter 330 sets forth the standards for granting a CPCN, directing the Commission to make specific findings with regard to the need for the proposed transmission line in accordance with 3132(6).  65-407 C.M.R. ch. 330, § 9(A).  Section 9(B) of Chapter 330 is titled "Public Need Defined."  It states:

> The Commission *establishes public need by determining that ratepayers will benefit by the proposed transmission line.*  Benefits are determined based upon the electrical need for the line, taking into account [the section 3132(6) factors] . . . .  Cost is an important consideration, but public need can be established for a proposed transmission line that is not the least cost alternative because aesthetic, environmental or other factors justify a reasonable cost increase.

*Id*. § 9(B) (emphasis added).

[¶25]    The Commission interpreted the public need standard as "essentially a general standard of meeting the public interest," requiring a careful weighing of the project's benefits and costs to Maine ratepayers and residents.  The Commission contends that, "[u]nder the circumstances of this proceeding," its application of the public need standard was consistent with

section 3132(6) and Chapter 330. CMP maintains that the statute does not plainly compel a contrary result because the Commission's "comparison of costs and benefits to Maine and Maine ratepayers is precisely what is required in the public need analysis, as reflected in section 3132(6), Chapter 330, and [this] Court's previous definition of public necessity and convenience." *See Enhanced Commc'ns of N. New England v. Pub. Utils. Comm'n*, 2017 ME 178, ¶ 11 n.4, 169 A.3d 408.

[¶26] Given the breadth of the concept of "public need" combined with the absence of any legislative definition, we must conclude that the term is ambiguous, and we cannot say that the Commission erred as matter of law by concluding that the term "public need" is a general standard of meeting the public interest. "An agency's interpretation of an ambiguous statute it administers is reviewed with great deference and will be upheld unless the statute plainly compels a contrary result." *Cent. Maine Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451 (quotation marks omitted); *see also Enhanced Commc'ns*, 2017 ME 178, ¶ 7, 169 A.3d 408. The Commission's interpretation of its own rules, regulations and procedures is similarly entitled to considerable deference. *Enhanced Commc'ns*, 2017 ME 178, ¶ 7, 169 A.3d 408; *Cent. Maine Power Co.*, 2014 ME 56, ¶ 18, 90 A.3d 451.

[¶27]   The Commission's definition is consistent with its rules, the legislative intent reflected in the statute, and Maine jurisprudence.  *See Enhanced Commc'ns*, 2017 ME 178, ¶ 11 n.4, 169 A.3d 408.  In this context, the Commission's interpretation of the term "public need" and the manner in which it is to be determined was not error.

2.    Application of Section 3132(6)

[¶28]  We now consider whether the record supports the Commission's finding of a public need.  Section 3132(6) requires the Commission to make specific findings with regard to the public need for a proposed transmission line.  "In determining public need, the Commission shall, at a minimum, take into account economics, reliability, public health and safety, scenic, historic and recreational values, state renewable energy generation goals, the proximity of the proposed transmission line to inhabited dwellings and alternatives to the construction of the transmission line . . . ."  35-A M.R.S. § 3132(6).

[¶29]  In addition to its general objection to the Commission's finding of a public need pursuant to section 3132(6), NextEra specifically contends that the Commission failed to properly address Maine's renewable energy generation goals and the NECEC's adverse impact on scenic and recreational values.

16

[¶30]  In its comprehensive order, the Commission discussed the factors set out in section 3132(6), including the issues raised by NextEra concerning scenic and recreational values and Maine's renewable energy generation goals. The Commission found that the value to Maine resulting from the NECEC's energy price suppression effect would amount to $14 - $44 million annually,[14] and capacity market price reduction for Maine residents in the amount of $19 million annually over the first ten years.  It found that there would be enhancements to transmission reliability and supply reliability and diversity. The Commission also found that the project would result in a reduction of greenhouse gas emissions.  Further, it found that the project would have a positive impact on Maine's gross domestic product, averaging $94-$98 million during the project's construction period.  All of these findings are supported by significant record evidence.

---

[14] The Commission's order includes a chart containing a summary of the benefits to Maine of the NECEC and the stipulation provisions. *See Central Maine Power Company*, Request for Approval of CPCN for the New England Clean Energy Connect Consisting of the Construction of a 1,200 MW HVDC Transmission Line from the Québec-Maine Border to Lewiston (NECEC) and Related Network Upgrades, No. 2017-232, Order Granting Certificate of Public Convenience and Necessity and Approving Stipulation at 7 (Me. P.U.C. May 3, 2019).  The value to Maine of the wholesale market effects is estimated at between $200 million and $500 million, the annual macroeconomic effects to Maine are estimated to be upwards of $125 million, and it is estimated that regional carbon emissions will be reduced by 3.0-3.6 million metric tons annually. *See id.*

a.  Adverse Impact

[¶31]   There is no dispute that the Commission found that the transmission line would have an adverse impact on scenic and recreational values; tourism; and local economies.  However, NextEra contends that the Commission abused its discretion by deferring to the Department of Environmental Protection (DEP) and the Land Use Planning Commission (LUPC) on the issue of mitigation of these adverse impacts.  NextEra does not argue that the Commission failed to consider the impact on scenic and recreational values—only that it did not properly consider mitigation.  This argument is unpersuasive.

[¶32]  In determining public need, the Commission must take scenic and recreational values into account.  *See* 35-A M.R.S. § 3132(6).  Section 3132(6) also provides that the Commission "shall . . . consider the findings of the Department of Environmental Protection."  NextEra asserts that "there is no language in the statutory scheme of [s]ection 3132 that authorizes the Commission to delegate the consideration of the mitigation measures to another state agency."  While the Commission recognized that it maintains coextensive jurisdiction with the DEP and the LUPC with regard to any impact

on scenic and recreational values, it did not defer to those agencies its own consideration pursuant to section 3132(6).

[¶33]   Following the mandates of section 3132(6), the Commission properly considered scenic and recreational values and concluded that they would be adversely impacted by the NECEC project.  That the Commission did not undertake consideration of any mitigation of those adverse impacts is immaterial because the statute imposes no such obligation on the Commission. *See id.*  We reject NextEra's argument on this point.

b.      State Renewable Energy Generation Goals

[¶34]  Section 3132(6) also requires the Commission to consider Maine's renewable energy generation goals.  The Commission found that the NECEC project would not adversely impact those goals.

[¶35]  NextEra posits that the Commission erred as a matter of law in relegating the consideration of the State's renewable energy generation goals to a weighing of benefits and costs.  NextEra asserts that the Commission misinterpreted the relevant statutes and made erroneous factual findings in light of that misinterpretation.[15]

---

[15]  NextEra also contends that the Commission failed to make findings regarding the NECEC's high-voltage direct-current design, as opposed to an alternating-current design, and asserts that the Commission could have conditioned the CPCN on an alternative NECEC design that would use alternating current technology.  This argument fails for myriad reasons, one of which is that the

[¶36] As set forth in the relevant statutory provisions,[16] the Commission determined that the renewable energy generation goals to be considered include the promotion of adequate, reliable, and diverse sources of electricity supply, and the reduction in greenhouse gas emissions. The Commission also concluded that the Maine Solar Energy Act, 35-A M.R.S. §§ 3471-3474 (2018), and the Maine Wind Energy Act, 35-A M.R.S. §§ 3401-3404 (2018), bear on the consideration of renewable energy generation goals by implementing a state policy of encouraging appropriately-sited wind and solar energy development, and therefore must be considered as part of the analysis of renewable energy generation goals pursuant to section 3132(6).

[¶37] The Commission considered the goals of renewable energy generation as part of its section 3132(6) analysis. In doing so, the Commission found that the NECEC project will result in incremental hydroelectric

---

NECEC project as proposed with the direct-current design was selected as the winning bid and a separate proposal using an alternating-current design was not. Additionally, the Commission found that the NECEC project, as designed with direct current technology, would not hinder Maine's renewable energy goals and may even facilitate renewable energy development. These findings are supported by substantial record evidence.

   [16] *See* 35-A M.R.S. § 3210(1) (2018); 38 M.R.S. § 631(1) (2018). The Commission explained that Maine's renewable-energy portfolio standards are governed by 35-A M.R.S. § 3210(1), which states:

> In order to ensure an adequate and reliable supply of electricity for Maine residents and to encourage the use of renewable, efficient and indigenous resources, it is the policy of this State to encourage the generation of electricity from renewable and efficient sources and to diversify electricity production on which residents of this State rely in a manner consistent with this section.

20

generation; will reduce greenhouse gas emissions in the region; will not hinder Maine's progress towards meeting its statutory renewable energy portfolio requirements and solar and wind energy goals; may benefit future renewable energy generation projects as a result of the upgrades that ISO New England (ISO-NE)[17] has already identified as necessary to the interconnection of new renewable energy generation in western and northern Maine; will have no impact on any proposed renewable energy generation projects in Maine that have a better interconnection queue position;[18] and has the potential to facilitate renewable generation in Maine by providing for additional transfer capacity at no cost to future generation developers. These factual findings are supported by substantial evidence in the record. *See Friedman v. Pub. Utils. Comm'n*, 2016 ME 19, ¶ 10, 132 A.3d 183.

[¶38] Section 3132(6) requires only that the Commission take into account state renewable energy generation goals—it does not specify *how* the

---

[17] ISO-NE is the regional transmission organization authorized by the Federal Energy Regulatory Commission to operate New England's power grid, administer New England's wholesale-electricity markets, and ensure that New England's electricity needs are met through power-system planning. *See Our Three Critical Roles*, ISO New England, https://www.iso-ne.com/about/what-we-do/three-roles (last visited March 12, 2020).

[18] "The ISO New England Interconnection Queue lists the current status of requests for the interconnection of new or uprated (increased capacity) generating facilities in New England." *Interconnection Request Queue*, ISO New England, https://www.iso-ne.com/system-planning/transmission-planning/interconnection-request-queue/ (last visited March 12, 2020). Queue position "determines order for the purposes of interconnection study and cost allocation." *Id.*

Commission is to consider those goals. Here, the Commission made specific factual findings and considered Maine's renewable energy generation goals in light of those findings as part of its overall public need analysis. The Commission's conclusions regarding the NECEC project and Maine's Renewable Energy Goals were reasonable and consistent with the law. *See Pine Tree Tel. & Tel. Co. v. Pub. Utils. Comm'n,* 634 A.2d 1302, 1304 (Me. 1993) ("The Commission's decision will not be disturbed if it results from a reasonable exercise of discretion and is supported by substantial evidence in the record.").

D.      The Stipulation

[¶39]  During the course of the proceeding, CMP negotiated a stipulation with a number of the parties, pursuant to Chapter 110, Section 8(D) of the Commission's Rules. The stipulation was joined by CMP, the Office of the Public Advocate, the Industrial Energy Consumer Group, the Governor's Energy Office, the Conservation Law Foundation, the Acadia Center, the Western Mountains and Rivers Corporation, the City of Lewiston, the Maine State Chamber of Commerce, the International Brotherhood of Electrical Workers Local Union 104, and Friends of Maine Mountains. The thirty-eight-page stipulation recommended approvals and findings regarding issuance of the CPCN, CPCN conditions, and nontransmission alternatives. The stipulating parties agreed

22

that a public need exists for the NECEC project and that construction of the NECEC project is in the public interest.

[¶40] The Commission's rules set forth four requirements for approval of a stipulation, including that the stipulating parties represent a "sufficiently broad spectrum of interests" to ensure that there is no appearance or reality of disenfranchisement. 65-407 C.M.R. ch. 110, § 8(D)(7). "Sufficiently broad spectrum of interests" is not defined in the rules, but has been interpreted by the Commission as prohibiting stipulations where the signing parties represent only a narrow interest.[19] This interpretation is entitled to deference. *See Enhanced Commc'ns*, 2017 ME 178, ¶ 7, 169 A.3d 408.

[¶41] We are unpersuaded by NextEra's assertion that the stipulating parties did not represent a sufficiently broad spectrum of interests.[20] Here, the

---

[19] *See Central Maine Power Company and Public Service of New Hampshire,* Request for Certificate of Public Convenience and Necessity for the Maine Power Reliability Program Consisting of the Construction of Approximately 350 Miles of 345 kV and 115 kV Transmission Lines, No. 2008-255, Order Approving Stipulation at 20 (Me. P.U.C. June 10, 2010) ("[T]he primary purpose of the Commission's first stipulation approval criterion . . . is to ensure that the Commission does not approve stipulations where the signing parties represent only a narrow interest."); *see also Public Utilities Commission,* Investigation into Verizon Maine's Alternative Form of Regulation, No. 2005-155, Order Approving Stipulation (Me. P.U.C. Oct. 3, 2007); *Public Utilities Commission*, Investigation Into Regulatory Alternatives for the New England Telephone and Telegraph Company d/b/a NYNEX, No. 94-123, Order at 5 (Me. P.U.C. March 17, 1998).

[20] NextEra also argues the Commission erred by approving the stipulation because certain provisions relate to obligations of entities outside of the Commission's jurisdiction. Because the Commission explicitly found that "even without the additional benefits provided by the CPCN Conditions set forth in [the] Stipulation . . . the NECEC would meet the statutory public need and

Commission found that the signatories "represent a comparably diverse and broad spectrum of interests," including the interests of Maine ratepayers, large industrial customers, members of the environmental community, large and small businesses, electrical workers, and at least one affected municipality. The Commission also gave significant weight to the Governor's participation in the development of and support for the negotiated stipulation—finding that her support "enhance[d] the breadth of the spectrum of interests." Given the breadth and diversity of the interests of the signatories to the stipulation, the Commission concluded that there was no appearance or reality of disenfranchisement. That conclusion is consistent with the Commission's precedents interpreting what constitutes a "sufficiently broad spectrum of interests." The Commission did not abuse its discretion when it concluded that the stipulation satisfied the approval criteria contained in its rules. *See* 65-407 C.M.R. ch. 110, § 8(D).

[¶42] Although the Commission concluded that the provisions included in the stipulation "augment the benefits that will be realized by Maine ratepayers, communities and the environment by funding mechanisms and

public interest standards of Title 35-A, Section 3132 and, thus, would be granted a CPCN[,]" we do not address this argument.

24

programs to provide rate relief to Maine ratepayers, benefits for low-income customers, and support for a variety of other programs intended to benefit Maine communities and the environment," the Commission did not rely upon the stipulation in arriving at its determination of public need or its decision to grant the CPCN.[21]  Thus, any issue regarding the validity of the stipulation becomes immaterial given that the Commission's reasoning rested on independent aspects of the record.

## III. CONCLUSION

[¶43]  The Commission followed the proper procedure and there is sufficient evidence in the record to support the findings it made.  In short, the Commission reasonably interpreted and applied the relevant statutory mandates in arriving at its decision to grant CMP a certificate of public convenience and necessity for the NECEC Project and in its decision to approve the stipulation.  *See* 35-A M.R.S. § 3132.  NextEra has not shown that the

---

[21] In addition to the economic benefits provided by the stipulation, *see supra* note 9, the stipulation conditions granting the CPCN on a preference for Maine workers; a commitment to long-term planning for decarbonization in the region; mitigation of the NECEC's impact on transmission system and existing and future energy resources in Maine; the securitization of certain funds established through the stipulation; and a support agreement for certain commitments made as part of the stipulation.  Finally, the stipulation provides that CMP will transfer and convey ownership of the project to NECEC Transmission LLC, a wholly owned subsidiary within the Avangrid Networks family that is *not* a subsidiary of CMP.  In order to protect ratepayers, the terms of the project's transfer include arrangements that will effectively separate CMP from the risks associated with the remaining development efforts and construction of the Project.

Commission's issuance of the CPCN or approval of the stipulation was arbitrary or otherwise based on an error of law.  *See Cent. Maine Power Co.*, 2014 ME 56, ¶ 25, 90 A.3d 451.

The entry is:

> Order of the Public Utilities Commission affirmed.

---

Jerrol A. Crouter, Esq. (orally), and Amy K. Olfene, Esq., Drummond Woodsum, Portland, for appellant NextEra Energy Resources, LLC

Mitchell M. Tannenbaum, Esq. (orally), Jordan D. McColman, Esq., and Amy B. Mills, Esq., Maine Public Utilities Commission, Augusta, for appellee Maine Public Utilities Commission

Anthony W. Buxton, Esq., R. Benjamin Borowski, Esq., and Joseph G. Donahue, Esq., Preti Flaherty Beliveau & Pachios, LLP, Portland, for appellee Industrial Energy Consumer Group

Catherine R. Connors, Esq., Jared S. de Rosiers, Esq. (orally), and Sarah B. Tracy, Esq., Pierce Atwood LLP, Portland, for appellee Central Maine Power Company

Barry J. Hobbins, Esq., Office of the Public Advocate, Augusta, for appellee Office of the Public Advocate

Public Utilities Commission case number 2017-00232
FOR CLERK REFERENCE ONLY