MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:       2020 ME 57
Docket:         BCD-20-126
Argued:         April 28, 2020
Decided:        May 7, 2020

Panel:          GORMAN, JABAR, HUMPHREY, and HORTON, JJ., and HJELM, A.R.J.

DELBERT A. REED

v.

SECRETARY OF STATE

PER CURIAM

[¶1]  In this proceeding for review of governmental action, *see* M.R. Civ. P. 80C, Delbert A. Reed appeals from a decision of the Business and Consumer Docket (*Murphy, J.*) affirming a decision of the Secretary of State that validated a direct initiative petition regarding the New England Clean Energy Connect Transmission Project (NECEC).[1]  Reed contends that the Secretary of State misinterpreted 21-A M.R.S. § 903-E (2018) by failing to invalidate signatures on petition documents notarized by notaries who he claims were unqualified to do so by operation of statute.  Reed also challenges the Secretary of State's

---

    [1]  Intervenors Industrial Energy Consumer Group (IECG) and the Maine State Chamber of Commerce (MSCC) also appeal from the Secretary of State's decision.

2

failure to conduct a more thorough fraud investigation of the initiative campaign's signature-gathering process.  We affirm the decision.

## I.  BACKGROUND

[¶2]  In 2019, the Maine Public Utilities Commission (PUC) issued a decision granting a certificate of public convenience and necessity for construction and operation of NECEC for the provision of hydroelectric power from Québec to New England via a 145-mile energy corridor located in Maine. *Central Maine Power Co.*, Request for Approval of CPCN for the New England Clean Energy Connect Consisting of the Construction of a 1,200 MW HVDC Transmission Line from the Québec-Maine Border to Lewiston (NECEC) and Related Network Upgrades, No. 2017-232, Order (Me. P.U.C. May 3, 2019); *see* 35-A M.R.S. § 3132 (2018);[2] *see generally NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n*, 2020 ME 34, --- A.3d ---.  Later that year, NECEC opponents commenced a direct initiative entitled, "Resolve, To Reject the New England Clean Energy Connect Transmission Project."  *See* 21-A M.R.S. § 901 (2018). The initiative proposed the adoption of a legislative resolve directing the PUC to amend its May 3, 2019, order to find that "the construction and operation of the NECEC transmission project are not in the public interest and that there is

---

[2]  Section 3132 has since been amended, but those amendments do not affect this appeal. P.L. 2019, ch. 298, §§ 7-11 (effective Sept. 19, 2019); P.L. 2019, ch. 177, § 1 (effective Sept. 19, 2019).

not a public need for the NECEC transmission project," and to deny the requested certificate of public convenience and necessity on that basis.

[¶3]   The direct initiative process allows Maine voters to propose legislation for inclusion on a statewide ballot by obtaining a minimum number of voter signatures on petitions in compliance with various constitutional and statutory requirements.  Me. Const. art. IV, pt. 3, §§ 18(2), 20, 22 (requiring that a valid direct initiative petition must be signed by "not . . . less than 10% of the total vote for Governor cast in the last gubernatorial election preceding the filing of such petition"); 21-A M.R.S. §§ 901-906 (2018);[3] *Me. Taxpayers Action Network v. Sec'y of State*, 2002 ME 64, ¶¶ 3, 10, 19, 795 A.2d 75.  Signatures must be obtained by qualified petition circulators—either volunteers or compensated individuals—according to an established procedure.  Me. Const. art. IV, pt. 3, § 20; 21-A M.R.S. § 903-A; *see Me. Taxpayers Action Network*, 2002 ME 64, ¶¶ 4, 11, 795 A.2d 75.

[¶4]   The procedural requirement primarily at issue here provides that "[t]he circulator of a petition must sign the petition and verify by oath or affirmation before a notary public or other person authorized by law to

---

[3]  Portions of the direct initiative statute have since been amended, but those amendments do not affect this appeal.  P.L. 2019, ch. 456, §§ 1-5 (effective Sept. 19, 2019); P.L. 2019, ch. 414, §§ 1-2 (emergency, effective June 20, 2019); P.L. 2019, ch. 152, § 1 (effective Sept. 19, 2019).

administer oaths or affirmations that the circulator personally witnessed all of the signatures to the petition and that to the best of the circulator's knowledge and belief each signature is the signature of the person whose name it purports to be and that each signature . . . was made by the authorized signer in the presence and at the direction of the voter." 21-A M.R.S. § 902; *see* Me. Const. art. IV, pt. 3, § 20; *Knutson v. Dep't of Sec'y of State*, 2008 ME 124, ¶ 11, 954 A.2d 1054; *Me. Taxpayers Action Network*, 2002 ME 64, ¶ 11, 795 A.2d 75; *Palesky v. Sec'y of State*, 1998 ME 103, ¶ 10, 711 A.2d 129. Upon administering that oath, the notary must sign a notarial certificate on each petition. 21-A M.R.S. § 902. The circulator's oath is "pivotal to the circulation process." *Knutson*, 2008 ME 124, ¶ 23, 954 A.2d 1054 (quotation marks omitted).

[¶5] After municipal verification that the signatories are qualified voters, petitions must be submitted to the Secretary of State for certification. Me. Const. art. IV, pt. 3, § 20; 21-A M.R.S. § 902; *Palesky*, 1998 ME 103, ¶ 13, 711 A.2d 129. At this stage, the Secretary of State must review the petitions filed and "shall determine the validity of the petition and issue a written decision stating the reasons for the decision." 21-A M.R.S. § 905(1).

[¶6]   On February 3, 2020, the initiative proponents filed with the Secretary of State a total of 15,785 petitions bearing 82,449 signatures.[4]  By letter and attached documentation, Clean Energy Matters (CEM) raised various challenges to many of the signatures on the petitions, including the assertion that at least eight notaries were statutorily not qualified to notarize circulator oaths because those notaries also performed nonnotarial services for the campaign.  *See* 4 M.R.S. § 954-A (2018); 21-A M.R.S. § 903-E.

[¶7]  By decision dated March 4, 2020, the Secretary of State invalidated a total of 12,735 of the signatures for a variety of reasons but declined to consider whether any notaries were disqualified for having also performed nonnotarial services for the campaign.  The Secretary explained, "This office did not have sufficient time . . . to investigate this matter prior to the statutory deadline for issuing this decision and thus make[s] no findings regarding [CEM's] allegations."  *See* 21-A M.R.S. § 905(1).  Because 69,714 signatures remained—still more than the 63,067 required—the Secretary of State declared the proposed legislation eligible for a statewide vote pursuant to section 905(1).

---

[4]  There is no dispute that, according to the total gubernatorial vote in the last election, the initiative proponents were required to gather at least 63,067 valid signatures to have the proposed legislation propounded for a statewide vote.  *See* Me. Const. art. IV, pt. 3, § 18(2).

6

[¶8]  Reed petitioned the Superior Court[5] (Kennebec County) for review of the Secretary of State's decision, arguing that the Secretary of State should have invalidated more than 17,000 signatures on petitions that he claimed had been notarized in violation of sections 903-E and 954-A.[6]  *See* 5 M.R.S. § 11001(1) (2018); 21-A M.R.S. § 905(2); M.R. Civ. P. 80C.  On Reed's motion, the court determined that the Secretary of State had not had sufficient opportunity to consider all of the allegations in CEM's submissions and that additional evidence was "material to the issues presented in the review" because the number of signatures that CEM challenged could affect the validity of the petition as a whole.  5 M.R.S. § 11006(1)(B) (2018).  The court thus remanded the matter to the Secretary of State to take additional evidence regarding CEM's allegations.  *See* 5 M.R.S. § 11007(4)(B) (2018); *Palesky*, 1998 ME 103, ¶ 14, 711 A.2d 129.

[¶9]  After remand, and based on the additional evidence that he collected, the Secretary of State issued an amended decision dated April 1,

_____

[5]  The matter was subsequently transferred to the Business and Consumer Docket with the agreement of the parties.

[6]  Mainers for Local Power (MLP); NextEra Energy Resources, LLC (NER); MSCC; and IECG were permitted to intervene in the matter. *See* 21-A M.R.S. § 905(2) (2018).  The court also granted Reed's motion for relief from the application of an emergency order to allow the matter to proceed notwithstanding the limitations on court operations necessitated by COVID-19. *See* Pandemic Management Order from the Trial Court Chiefs Consolidating, Ratifying, and Superseding Previous Orders, Me. Admin. Order PMO-TC-1 (effective Apr. 14, 2020).

2020, containing the following findings, accompanied by the Secretary's conclusions and determinations based on those findings. All of the findings are supported by competent evidence in the agency record.[7]

- David McGovern Sr. both circulated petitions and later notarized petitions for other circulators. Because he performed both notary and nonnotary services for the campaign, the 110 signatures on the petitions he notarized are invalid.

- Michael Underhill circulated petitions and later notarized petitions for another circulator. Because he performed both notary and nonnotary services for the campaign, the 69 signatures on the petitions he notarized are also invalid.

- Wesley Huckey works in a city clerk's office. With his employer's permission, he was hired to notarize petitions for the campaign on the evenings and weekends. He was not hired to perform any other services for the campaign. On one occasion, however, he transported certified petitions from the city clerk's office to the campaign field office. Although the Secretary of State found that this conduct "could" constitute a violation of 21-A M.R.S. § 903-E, he determined that any such violation was de minimis and declined to invalidate the affected signatures on that basis.[8]

- Leah Flumerfelt was originally recruited to be a circulator for the initiative. When the campaign learned that she was a notary, it instead hired her to notarize petitions. On one occasion, she also delivered petitions to town offices, and, during one weekend, she organized petitions in the campaign office and cleaned the campaign office. The Secretary of State concluded that because all of Flumerfelt's notarizations

---

[7] Findings as to notaries whose activities are no longer challenged are omitted from this recitation of the facts.

[8] The Secretary of State also noted that if Huckey were deemed unqualified to notarize any petitions *after* he delivered petitions to the field office, 2,555 signatures would be invalidated.

8

occurred before she performed these nonnotarial services, all of the signatures on petitions she notarized are invalid.

- Brittany Skidmore was hired as a notary for the campaign, and she performed notary services from December 17, 2019, to January 24, 2020. During the week of January 27, 2020, she worked in the campaign field office, reviewing petitions she had notarized and filling in gaps in her notary log, and she notarized some circulator affidavits. The Secretary of State concluded that these acts constituted part of her notary services.

  Skidmore also reviewed those petitions to make sure that the circulator's name and identification number were properly written on each petition, *see* 21-A M.R.S. § 901-A(2); she filled in the circulator's name and identification number on multiple petition forms. She also found one petition (which she had not notarized) that she placed with other invalid petitions. As with Flumerfelt, the Secretary of State concluded that, because Skidmore had not notarized any petitions after she performed these nonnotarial services, at the time she notarized the petitions, she was qualified to do so.[9]

- Two individuals attested that they did not sign petition #743, circulated by Megan St. Peter, although their purported signatures appeared on that petition. The municipal registrar had already rejected both signatures, however, and both—along with almost all of the other signatures on petition #743—were already invalidated in the Secretary of State's original order. Based on the additional information, the Secretary of State concluded that St. Peter's oath could not be relied upon at all, and he invalidated all 174 signatures collected by St. Peter that had not already been invalidated.

---

[9] The Secretary of State also determined that Skidmore had improperly administered the oath to circulators for the first two weeks that she served as notary for the campaign. *See* 4 M.R.S. § 1015 (2018); 21-A M.R.S. § 902 (2018). On January 1, 2020, Skidmore was instructed regarding the proper notarization procedure, and she followed that practice thereafter. The Secretary of State thus invalidated the signatures on petitions notarized by Skidmore before January 2, 2020—a total of 1,873 signatures. This determination is not at issue on this appeal and leaves at issue the petitions that Skidmore notarized in January of 2020, described in the text.

The Secretary of State rejected Reed's request for a "full-scale investigation of potential fraud" with regard to the entire campaign based on the absence of any suggestions of fraud beyond those regarding petition #743.

[¶10]   In total, the Secretary of State invalidated an additional 3,597 signatures for reasons that included the conduct of McGovern, Underhill, Skidmore, and St. Peter.  Because the Secretary of State determined that 66,117 signatures remained valid—3,050 more than the 63,067 required—the Secretary of State again concluded that the initiative petition was valid. *See* 21-A M.R.S. § 905(1).

[¶11]  By judgment dated April 13, 2020, the court affirmed the Secretary of State's amended decision.  *See* 5 M.R.S. § 11007(4)(A) (2018); 21-A M.R.S. § 905(2).  Reed, IECG, and MSCC (collectively, or in some combination, Reed) each appeal from the court's decision.[10]   *See* 5 M.R.S. § 11008(1) (2018); 21-A M.R.S. § 905(3); M.R. Civ. P. 80C(m); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶12]   Reed's arguments can be condensed to two claims: that the Secretary of State erred by (1) validating the petitions notarized by three

---

[10]   We invited any interested person or entity to file a brief as an amicus curiae pursuant to M.R. App. P. 7A(e); we received an amicus curiae brief from former State Senator Garrett Mason and former State Representative Kevin Battle.

notaries—Huckey, Flumerfelt, and Skidmore—based on the Secretary of State's misinterpretation and misapplication of 21-A M.R.S. § 903-E and 4 M.R.S. § 954-A and (2) failing to conduct a more thorough fraud investigation of the entire petition.[11] When, as here, the Superior Court acts in its intermediate appellate capacity pursuant to Rule 80C, we review directly the Secretary of State's decision for errors of law, findings not supported by the evidence, or an abuse of discretion. *Hammer v. Sec'y of State*, 2010 ME 109, ¶ 2, 8 A.3d 700.

A.    Sections 903-E and 954-A

[¶13]   Reed argues that the Secretary of State misinterpreted and misapplied sections 903-E and 954-A by finding that Flumerfelt and Skidmore each performed both notarial and nonnotarial services for the campaign but by nevertheless failing to invalidate all of the signatures on the petitions they notarized.[12] The Secretary of State declined to apply section 903-E to instances

---

[11] We have no reason to address the constitutionality of 21-A M.R.S. § 903-E (2018) or 4 M.R.S. § 954-A (2018) because, although Reed, in briefs filed simultaneously with the Secretary of State's, MLP's, and NER's, defended those statutes, none of the parties who appealed from the Secretary of State's decision ended up arguing that either provision is unconstitutional. *See Johnson v. The Home Depot USA, Inc.*, 2014 ME 140, ¶ 5 n.1, 106 A.3d 401 (declining to reach an assertion of error raised by a party who did not appeal).

[12] Reed contests the Secretary of State's conclusion that petitions notarized by Michael Huckey should not be invalidated because his nonnotarial acts in service of the campaign were "*de minimis.*" At oral argument, counsel for Reed indicated that the resolution of this issue would not change the outcome of this litigation because the 2,555 signatures that would be invalidated if we were to vacate the Secretary of State's decision in this regard would not bring the campaign below the threshold of 63,067 signatures that it was required to collect. Therefore, we decline to reach this issue.

in which Flumerfelt and Skidmore had performed some nonnotarial services for the campaign because he concluded that the provision of nonnotarial services *after* notarial services did not retroactively disqualify a notary, that is, a notary is only disqualified from notarizing petitions *after* the point at which he or she performs nonnotarial services. Reed argues that section 903-E instead requires the Secretary of State to disqualify notaries who performed nonnotarial services for the campaign at any point, without regard for the scope of those nonnotarial services or the sequence or timing of the notarial and nonnotarial services.

[¶14] We interpret every statute de novo as a matter of law to "give effect to the intent of the Legislature," first by examining its plain language. *Knutson*, 2008 ME 124, ¶ 9, 954 A.2d 1054; *see Melanson v. Sec'y of State*, 2004 ME 127, ¶ 8, 861 A.2d 641. If the plain language is unambiguous, we interpret the statute according to its unambiguous meaning. *NextEra Energy Res., LLC*, 2020 ME 34, ¶ 22, --- A.3d ---. If, however, a statute is ambiguous—i.e., "it is reasonably susceptible to different interpretations"—we defer to the agency's reasonable construction when the agency is tasked with administering the statute and it falls within the agency's expertise. *Id.* (quotation marks omitted).

12

[¶15] Title 21-A M.R.S. § 903-E states,

**1. Certain notaries public and others.** A notary public or other person authorized by law to administer oaths or affirmations generally is not authorized to administer an oath or affirmation to the circulator of a petition under section 902 if the notary public or other generally authorized person is:

**A.** Providing any other services, regardless of compensation, to initiate the direct initiative or people's veto referendum for which the petition is being circulated. For the purposes of this paragraph, "initiate" has the same meaning as section 1052, subsection 4-B; or

**B.** Providing services other than notarial acts, regardless of compensation, to promote the direct initiative or people's veto referendum for which the petition is being circulated.

Title 4 M.R.S. § 954-A similarly provides, in relevant part,[13]

It is a conflict of interest for a notary public to administer an oath or affirmation to a circulator of a petition for a direct initiative or people's veto referendum under Title 21-A, section 902 if the notary public also provides services that are not notarial acts to initiate or promote that direct initiative or people's veto referendum.

---

[13] By their plain terms, 4 M.R.S. § 954-A and 21-A M.R.S. § 903-E are complementary provisions intended to address the same ethical concern in two different ways—section 903-E by limiting the qualifications of a notary in a direct petition campaign, and section 954-A by making such conduct subject to disciplinary action. *See* 21-A M.R.S. § 955-C(1)(C) (2018). Section 954-A was not just codified contemporaneously with section 903-E, but was proposed and enacted as part of the same bill. P.L. 2017, ch. 418, §§ 1, 3 (effective Dec. 13, 2018); L.D. 1865 (128th Legis. 2018). Section 954-A therefore sheds light on the Legislature's intent as to section 903-E. *See Blanchard v. Dep't of Transp.*, 2002 ME 96, ¶ 23, 798 A.2d 1119 ("[T]he whole body of previous and contemporaneous legislation upon a particular topic should be considered in interpreting any statute." (quotation marks omitted)). In any event, a notary's violation of any ethical responsibility—even one outside Title 21-A—could be a basis for the invalidation of direct initiative petition signatures, just as the Secretary did here with respect to a different notary. *See Me. Taxpayers Action Network v. Sec'y of State*, 2002 ME 64, ¶ 12, 795 A.2d 75 (discussing the Secretary of State's obligation to invalidate signatures obtained in violation of both constitutional and statutory requirements).

[¶16]  Notably, sections 954-A and 903-E are both phrased in the present tense.  4 M.R.S. § 954-A (stating that a conflict of interest exists if the notary "*provides* services that are not notarial acts" (emphasis added)); 21-A M.R.S. § 903-E (stating that a notary is not authorized if the notary "is . . . [p]roviding" any nonnotarial services to the campaign).  Neither statute expressly speaks to the effect of nonnotarial acts committed in the past or the future.  Neither contains a past tense phrase, such as "has provided services," or a future tense phrase, such as "will provide services."

[¶17]  A literal reading of these statutes might suggest that a notary is disqualified only if the notary "is providing" nonnotarial services to the initiative campaign at the precise time that he or she performs a notarial act.  Such a reading would defeat the obvious legislative purpose of discouraging fraudulent notarizations related to direct initiative campaigns, however, because a petition circulator who is also a notary could then simply alternate between performing notarial work and nonnotarial work without violating sections 954-A and 903-E.  We are confident the Legislature did not intend this absurd result.  *See Doe v. Reg'l Sch. Unit 26*, 2014 ME 11, ¶ 15, 86 A.3d 600 ("We have the power and duty to interpret statutes so as to avoid absurd results." (alterations omitted) (quotation marks omitted)); *see also Dickau v. Vt.*

*Mut. Ins. Co.*, 2014 ME 158, ¶ 20, 107 A.3d 621 ("A plain language interpretation should not be confused with a literal interpretation . . . ."). Thus, the plain language of the statutes, standing alone, does not clearly establish their temporal reach. We therefore are satisfied that there is more than one reasonable interpretation of section 903-E and section 954-A; the statutes are ambiguous. *See NextEra Energy Res., LLC*, 2020 ME 34, ¶ 22, --- A.3d ---.

[¶18] The Secretary of State is the constitutional officer entrusted with administering—and having expertise in—the laws pertaining to the direct initiative process. Me. Const. art. IV, pt. 3, § 18; *Me. Taxpayers Action Network*, 2002 ME 64, ¶ 12 n.8, 795 A.2d 75. We therefore defer to the Secretary of State's reasonable interpretation of these ambiguous statutes. *See NextEra Energy Res., LLC*, 2020 ME 34, ¶ 22, --- A.3d ---; *Melanson*, 2004 ME 127, ¶¶ 8, 13, 15, 861 A.2d 641 (upholding the Secretary of State's interpretation of a direct initiative statutory provision as "both reasonable and warranted when reading the statute in context"); *Knutson*, 2008 ME 124, ¶¶ 13, 18, 954 A.2d 1054 (deferring to the Secretary of State's statutory construction as "eminently sensible").

[¶19] The Secretary of State's interpretation of the statutes at issue here focuses on the sequence in which a notary provides notarial services and

nonnotarial services to the campaign. The Secretary of State invalidated the petitions notarized by McGovern and Underhill because they had *previously* provided nonnotarial services to the campaign by circulating petitions. On the other hand, the Secretary of State did *not* invalidate petitions notarized by Flumerfelt and Skidmore because they provided nonnotarial services to the campaign only *after* completing their notarial work.[14] This interpretation of sections 903-E and 954-A is reasonable because it is consistent with their language. The statutes, in effect, create exceptions to a notary's otherwise-existing authority to provide notarial services in certain circumstances. Those exceptions arise when specified circumstances are present. Neither statute, however, specifically purports to deauthorize a notary's authority to have provided notarial services *post hoc*, that is, based on events occurring or circumstances arising *after* the services have already been provided.

[¶20] Similarly, the Secretary of State's construction and application of sections 954-A and 903-E are also reasonable given the longstanding general

---

[14] Reed also argues that Flumerfelt performed services for the campaign *before* performing notarial services because the campaign initially hired her as a circulator before designating her as a notary. Despite Reed's assertions, the Secretary of State did not find that Flumerfelt performed any services for the campaign before completing her notarial work, and the record contains no suggestion otherwise.

16

principle that the validity of a notarial act is determined by reference to the circumstances that existed at the time of the act, not by reference to unrelated circumstances arising afterward.[15] *See United States v. Curtis*, 107 U.S. 671, 672-73 (1883) ("[T]he underlying question is whether the notary public . . . was, *at the respective dates of the oaths taken by [the defendant]*, authorized by the laws of the United States to administer such oaths." (emphasis added)). Reed's contrary contention—that the statutes reach retroactively, so as to prohibit notaries from providing nonnotarial services to a direct initiative campaign at any time before the petitions are submitted to the Secretary of State—would retroactively invalidate and undo notarial acts that were authorized and valid when performed. It therefore would materially alter the law of notaries in contravention of the established principle that "we construe a statute to alter the common law only to the extent the Legislature makes clear its intent to do so." *Watts v. Watts*, 2003 ME 36, ¶ 9, 818 A.2d 1031.

---

[15] We have embraced this principle in a variety of contexts. *See, e.g.*, *State v. Doughty*, 399 A.2d 1319, 1326 (Me. 1979) (discussing perjury based on "the intent and belief of the accused at the time he testified under oath") (quotation marks omitted)); *State v. Blaisdell*, 253 A.2d 341, 348 (Me. 1969) ("To make a valid oath, for the falsity of which perjury will lie, there must be in some form, in the presence of an officer authorized to administer it in relation to material matter regarding which an oath is authorized by law, an unequivocal and present act by which the affiant consciously takes upon himself the obligation of an oath."); *Ross v. Berry*, 49 Me. 434, 442 (1862) (stating that, at the time that a bond oath was administered, the justices of the peace who administered it were "legally competent to act in the matter"); *Avery v. Butters*, 9 Me. 16, 17-18 (1832) (discussing the requirements of a military clerk's oath "at the time of administering it").

[¶21]  Finally, the Secretary of State's interpretation rationally advances the legislative purpose of discouraging fraudulent notarizations by prohibiting the use of notaries who have a demonstrable conflict of interest *at the time of their notarial acts* in connection with the campaign.

[¶22]  In light of the deference we must afford the agency given the statutory ambiguities, we conclude that the Secretary of State did not err by declining, pursuant to sections 903-E and 954-A,[16] to invalidate the petitions that were notarized by Flumerfelt and Skidmore before they performed any nonnotarial services for the campaign.

B.     Fraud Investigation

[¶23]  Reed also contends that the Secretary of State, after being presented with evidence of fraud, erred by failing to conduct a fraud investigation of the entire campaign.  The evidence of fraud supplied to the Secretary of State consists of the following:

- The affidavits of two individuals whose signatures were forged on petition #743 and copies of petition #743.

- An affidavit from a principal of Revolution Field Strategies (RFS), the entity hired to manage the campaign, as well as related correspondence from Reed's counsel, stating that the predecessor company of RFS had

---

[16]  In affirming the Secretary of State's determination that the initiative proponents presented valid signatures numbering in excess of the constitutional requirement, we do not address any other aspect of the petition, including whether the petition comports with other constitutional or statutory requirements for a direct initiative of legislation.

either been involved with or was the victim of canvassers' fraud in a 2014 initiative campaign in Missouri.

- Correspondence from Reed's counsel asserting that two signatures gathered by St. Peter appeared to be duplicates of—and in different handwriting than—two signatures gathered by another circulator.

- Correspondence from Reed's counsel asserting that another RFS employee[17] stated that St. Peter's supervisor, Melissa Burnham, was aware of St. Peter's forged signatures and still submitted St. Peter's petitions for validation.

In particular, Reed argues that the Secretary of State had an obligation to investigate St. Peter's and Burnham's knowledge of fraudulent activity within the campaign.

[¶24]  Although Reed presented evidence that Burnham may have been aware of St. Peter's fraud, no allegations were made of fraud having been committed on any petition other than petition #743, which was invalidated in its entirety, or with regard to any circulator other than St. Peter, whose gathered signatures the Secretary of State already invalidated.  Instead, Reed has argued that the forgeries that the Secretary of State had already sussed out "provide indicia of systemic irregularities" and has asserted that other evidence "raises the significant possibility" of other forms of fraud.  Based on all of the

---

[17] Reed declined to name the employee in his letter to the Secretary of State but offered to provide it only if the Secretary would hold the information in confidence.  We need not reach the question of whether there is any authority for the Secretary to have acceded to that condition.

evidence presented, however, combined with the absence of any suggestion of fraud raised by municipal officers,[18] the Secretary of State reasonably determined that such broad assertions were insufficient grounds to launch an additional investigation of the entire campaign. *See Me. Taxpayers Action Network*, 2002 ME 64, ¶ 12 n.8, 795 A.2d 75. Although the Secretary of State certainly could have sought to interview Burnham, the RFS employee who identified Burnham, or both of those people, we cannot, in these circumstances, conclude that the Secretary of State's failure to do so constitutes an error of law or an abuse of discretion.

The entry is:

> Judgment affirmed.

---

[18] "If the registrar or clerk suspects that a petition was submitted in violation of any provision of this chapter, the registrar or clerk shall immediately notify the Secretary of State and provide a copy of the petition to the Secretary of State." 21-A M.R.S. § 902-A (2018). None did so in this matter.

Joshua A. Tardy, Esq., and Joshua A. Randlett, Esq., Rudman Winchell, Bangor; and Jared S. des Rosiers, Esq., Nolan L. Reichl, Esq. (orally), Joshua D. Dunlap, Esq., and Newell A. Augur, Esq., Pierce Atwood LLP, Portland, for appellant Delbert A. Reed

Sigmund D. Schutz, Esq., Anthony W. Buxton, Esq., and Robert B. Borowski, Esq., Preti Flaherty Beliveau & Pachios LLP, Portland, for appellant Industrial Energy Consumer Group

Gerald F. Petruccelli, Esq., and Nicole R. Bissonnette, Esq., Petruccelli, Martin & Haddow, Portland, for appellant Maine State Chamber of Commerce

Aaron M. Frey, Attorney General, and Phyllis Gardiner, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee Secretary of State

David M. Kallin, Esq. (orally), Amy K. Olfene, Esq., and Adam R. Cote, Esq., Drummond Woodsum, Portland, for appellee Mainers for Local Power

Christopher T. Roach, Esq., Roach Ruprecht Sanchez & Bischoff, P.C., Portland, for appellee NextEra Energy Resources, LLC

Patrick Strawbridge, Esq., Consovoy McCarthy PLLC, Boston, Massachusetts, for amici curiae Garrett Mason and Kevin Battle

Business and Consumer Docket docket number AP-20-02
FOR CLERK REFERENCE ONLY