1. Plaintiffs are: Ashburnham Municipal Light Plant, Boylston Municipal Light Department, Braintree Electric Light Department, City of Chicopee Municipal Lighting Plant, Danvers Electric Division, Georgetown Municipal Light Department, Hingham Municipal Light Plant, City of Holyoke Gas and Electric Department, Houlton Water Company, Hudson Light & Power Department, Hull Municipal Lighting Plant, Ipswich Municipal Light Department, Littleton Electric Light & Water Department, Marblehead Municipal Light Department, Middleborough Gas and Electric Department, Middleton Municipal Light Department, New Hampshire Electric Cooperative, Inc., North Attleborough Electric Department, Paxton Municipal Light Depart-

that Tang had failed to take reasonable steps to mitigate its damages. Bayley's simply failed to persuade the jury that Tang had not satisfied its " 'duty' to use reasonable efforts to mitigate its damages." *Marchesseault v. Jackson*, 611 A.2d at 99 (footnote omitted).

[¶ 14] Bayley's other arguments on appeal are without merit.

The entry is

Judgment affirmed.

1998 ME 270

### ASHBURNHAM MUNICIPAL LIGHT PLANT, et al.[1]

v.

### MAINE YANKEE ATOMIC POWER COMPANY, et al.[2]

Supreme Judicial Court of Maine.

Argued Oct. 5, 1998.

Decided Dec. 18, 1998.

ment, Peabody Municipal Light Plant, Shrewsbury's Electric Light Plant, Sterling Municipal Light Department, Taunton Municipal Lighting Plant, Templeton Municipal Light Plant, Wakefield Municipal Light Department, West Boylston Municipal Lighting Plant, and Westfield Gas & Electric Light Department.

2. Defendants are: Maine Yankee Atomic Power Company, (in its role as agent for the primary owners of the Maine Yankee Atomic Power Station), Central Maine Power Company, Bangor Hydro–Electric Company, Maine Public Service Company, New England Power Company, The Connecticut Light and Power Company, Western Massachusetts Electric Company, Public Service Company of New Hampshire, Cambridge Electric Light Company, Montaup Electric Company, and Central Vermont Public Service Corporation.

Gary Newell (orally), Margaret A. McGoldrick, Spiegel & McDiarmid Washington, DC, David Plimpton, Mary T. Esposito, Plimpton & Esposito, Portland, Brenda M. Buchanan, Warren, Currier & Buchanan, Portland, for plainitffs.

Catherine R. Connors (orally), Peter W. Culley, Christopher T. Roach, Pierce Atwood, Portland, for defendants.

Before WATHEN, C.J., and CLIFFORD, RUDMAN, SAUFLEY, and ALEXANDER, JJ.

WATHEN, C.J.

[¶ 1] Plaintiffs, Ashburnham Municipal Light Plant and twenty-six other retail electric service companies ("the secondary purchasers"), appeal from the order of the Superior Court (Cumberland County, *Calkins, J.*) denying without prejudice their motion to compel arbitration in their dispute with defendants Maine Yankee Atomic Power Company ("Maine Yankee") and its ten shareholders ("the primary owners").[3] The Superior Court denied the motion without prejudice on the ground that the Federal Energy Regulatory Commission ("FERC") should first determine whether it would exercise jurisdiction over the dispute. On appeal, the secondary purchasers contend that the court erred as a matter of law in denying the motion because the Maine Uniform Arbitration Act requires the court to order arbitration upon the showing that a valid written agreement to arbitrate exists. We find that the court did not abuse its discretion, and affirm the order.

[¶ 2] In 1971, each secondary purchaser entered into a thirty-year contract with the primary owners to purchase a small portion of the energy generated by the Maine Yan-

---

**3.** The primary owners are the ten defendant utility companies. Together they own all of the shares in Maine Yankee.

kee plant and to pay a fixed percentage on a monthly basis, whether or not any power was generated. In return, the primary owners agreed to exercise their best efforts to operate the plant.[4] In total, the secondary purchasers contracted for 5.8% of the power produced by the Maine Yankee power plant.

[¶ 3] The secondary purchase contracts contained an arbitration clause that stated:

In case any dispute shall arise as to the interpretation or performance of this Contract which cannot be settled by mutual agreement *and which may be finally determined by arbitration under the law of the State of Maine then in effect,* such dispute shall be submitted to arbitration, and arbitration of such dispute shall be a condition precedent to any action at law or suit in equity that can be brought.

(Emphasis added). Prior to the expiration of the contracts in 1997, the primary owners permanently retired Maine Yankee based on considerations of cost effectiveness after a shutdown caused by an equipment failure. At this point, a dispute arose between the parties. The secondary purchasers alleged that the primary owners' decision to retire Maine Yankee constituted a breach of the secondary purchase contracts and they refused to make any further payments despite continued billing from the primary owners. The primary owners, in turn, alleged that the secondary purchasers were in breach of the contracts because they did not make the monthly payments required by the contracts and the filed rate schedule rules. In November of 1997, the secondary purchasers served the primary owners with a written notice of the initiation of arbitration regarding the dispute. The primary owners refused to arbitrate, contending that FERC had primary, if not exclusive, jurisdiction over the dispute.

[¶ 4] In December of 1997, the primary owners filed a complaint with FERC requesting that it investigate the refusal of the secondary purchasers to make payments under the terms of the contract and extend the length of the contract until decommissioning is completed. In January of 1998, the secondary purchasers filed a motion to compel

---

4. The relevant provisions of the contracts are as follows:

1. *Sale of Power*: Sellers hereby agree to sell to Buyer and Buyer agrees to purchase from Sellers, during the term of this Contract, ___ percent of the capacity and net electrical output of the Unit ("Buyer's Percentage"), the portion of the Buyer's Percentage being sold by each Seller being the percentage thereof set forth opposite its name below. Buyer will, throughout the term of this Contract, be entitled and obligated to take Buyer's Percentage of the capacity and net electrical output of the Unit, at whatever level the Unit is operated or operable, whether more or less than 800,000 kilowatts electric.

. . . .

3. *Payment*: Buyer shall pay to Sellers with respect to each calendar month commencing at the beginning of the term hereof and continuing during the term hereof, whether or not any power is generated by the Unit, an amount equal to Buyer's Percentage of the payment due with respect to such calendar month from all of the Sponsors to Maine Yankee pursuant to Section 7 of the Power Contracts as said Power Contracts may be amended from time to time by the parties thereto. If the 9.8% per annum rate of return on equity presently specified in the Power Contracts or any other portion of the Sponsors' payments due under the Power Contracts increases or decreases, the amounts paid hereunder will increase or decrease correspondingly. In the event Sellers, or any of them, are required to pay a sales tax on or with respect to the sale hereunder or a gross receipts tax on the receipts derived from the sale hereunder, Buyer shall reimburse Seller or Sellers required to pay the same. . . .

. . . .

5. *Operation and Maintenance of the Unit*: Sellers will use their best efforts to cause Maine Yankee to operate and maintain the Unit in accordance with good utility practice under the circumstances and all applicable law, including the applicable provisions of the Atomic Energy Act of 1954, as amended, and of any licenses issued thereunder to Maine Yankee. Within the limits imposed by good utility practice under the circumstances and applicable law the Unit will be operated at its maximum capability and on a long hour use basis.

Outages for inspection, maintenance, refueling and repairs and replacements will be scheduled in accordance with good utility practice. In the event of an outage, Sellers will cause Maine Yankee to use its best efforts to restore the Unit to service as promptly as practicable.

. . . .

10. *Interpretation*: The interpretation and performance of this Contract shall be in accordance with and controlled by the law of the State of Maine.

arbitration in the Superior Court, pursuant to the Maine Uniform Arbitration Act, 14 M.R.S.A. §§ 5927–5949 (1980).

[¶ 5] The Maine Uniform Arbitration Act states: "A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract." 14 M.R.S.A. § 5927 (1980). The secondary purchasers argue that the Act requires the court to compel arbitration upon the demonstration by the movant that there is a valid written agreement to arbitrate. The court, in denying the motion without prejudice, effectively stayed the proceedings. The court noted the uniqueness of the situation and the possible futility of ordering arbitration at this time, and explained that "[i]f FERC concludes that it does not have jurisdiction or decides not to exercise jurisdiction, and [Maine Yankee and the primary owners] do not agree to arbitration, [the secondary purchasers] may return to this court to seek an order to compel arbitration."

[¶ 6] We have often declined to decide an issue that an administrative agency with jurisdiction has not yet considered. *See Levesque v. Town of Eliot*, 448 A.2d 876, 878 (Me.1982). Such deference is particularly appropriate when faced with the possibility that exclusive or primary jurisdiction rests in the administrative agency. With these concerns in mind, the court in this case deferred to FERC to allow it to determine its jurisdiction over the dispute.

[¶ 7] Under the "filed rate" doctrine, FERC has exclusive jurisdiction over the reasonableness of interstate wholesale rates for electricity. *See* 16 U.S.C. § 824(a) (1983). FERC has the power to review rates and modify them if they are unjust or unreasonable. *See Gulf States Utils. Co. v. Alabama Power Co.*, 824 F.2d 1465, 1470 (5th Cir.1987), *rev'd.* 831 F.2d 557 (5th Cir.1987) (revising one sentence of original opinion). State courts are completely preempted from acting within areas of FERC's exclusive jurisdiction. *See id.*

[¶ 8] Even if FERC's jurisdiction is not exclusive here, FERC may have primary jurisdiction. The doctrine of primary jurisdiction provides that "an administrative agency, such as the FERC, should be able to participate in decisions affecting a regulated industry, even when the agency does not have exclusive jurisdiction." *Gulf States Utils. Co.*, 824 F.2d at 1472. Whether FERC has primary jurisdiction over a contract dispute that would otherwise be subject to state court jurisdiction depends upon: 1. whether FERC possesses special expertise making the case particularly appropriate for it to decide; 2. whether there is a need for uniformity of interpretation of the type of question raised in the dispute; and 3. whether the case is distant from the regulatory responsibilities of FERC. *See Portland General Elec. Co.*, 72 F.E.R.C. ¶ 61,009, p. 61,021 (1995).

[¶ 9] The primary owners' complaint before FERC alleges that the decision to shut down Maine Yankee was made in accordance with good utility practice, and that as such, the secondary purchasers' refusal to make payments violates the filed rate doctrine. The complaint asserts that FERC has exclusive jurisdiction over the dispute because the secondary purchasers are in breach of the filed rate doctrine. FERC has not yet determined whether it will exercise jurisdiction over the complaint.

[¶ 10] FERC has, however, accepted jurisdiction in two closely related cases and scheduled consolidated hearings for April of 1999. In *Maine Yankee Atomic Power Co.*, 82 F.E.R.C. ¶ 61,010 (1998), FERC will review Maine Yankee's proposed amendments to its contracts with the primary owners. *See id.* at p. 61,035. The proposed amendments would implement the shutdown and impose decommissioning charges on the primary owners. *See id.* The secondary purchasers have intervened in that case. *See id.* Since the decision of the court in this case, FERC consolidated *Maine Yankee Atomic Power Co.* with *Maine Public Advocate v. Maine Yankee Atomic Power Co.* *See Maine Public Advocate v. Maine Yankee Atomic Power Co.*, 83 F.E.R.C. ¶ 61,122, p. 61,561 (1998). In that consolidated case,

FERC will review not only the prudency of Maine Yankee's management and operation, but also the reasonableness of the resultant charges and the decision to terminate the operation of the plant. *See id.* at p. 61,560.

[¶ 11] In their motion to compel arbitration, the secondary purchasers stated: "[r]esolution of the dispute will require an examination of the facts that led to the shut down decision, an interpretation of relevant provisions of the Secondary Purchase Contracts and a determination of whether the parties have met or failed to perform their obligations under the Secondary Purchase Contracts." Their notice of initiation of arbitration claims that the primary owners and Maine Yankee shut down the plant prematurely in violation of their obligation to utilize good utility practice and in contravention of the secondary purchase contracts.

[¶ 12] The dispute between the parties centers on a determination of whether the decision to terminate the operation of the plant was prudent and in accord with good utility practice. The need for a uniform interpretation is evident. FERC has both the expertise and regulatory responsibility to make this important decision. Moreover, FERC has already undertaken a determination of these issues. Based on the peculiar facts before it, the serious question as to the extent of FERC's jurisdiction, and the need for uniformity of interpretation of the type of question raised in the dispute, the court did not exceed the limited bounds of its discretion in concluding that the interests of the parties and the public would be best served by awaiting FERC's jurisdictional determination with reference to this complaint. It is in the exercise of its equitable powers that the court acted in this matter.

The entry is:

Judgment affirmed.