MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2025 ME 35
Docket:        Ken-23-348
Argued:        April 10, 2024
Decided:       April 10, 2025

Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

EASTERN MAINE CONSERVATION INITIATIVE et al.

v.

BOARD OF ENVIRONMENTAL PROTECTION

DOUGLAS, J.

[¶1]  Eastern Maine Conservation Initiative and Roque Island Gardner Homestead Corporation (collectively, "Petitioners") appeal from a judgment of the Superior Court (Kennebec County, *Murphy, J.*) affirming the Board of Environmental Protection's decision upholding a permit issued by the Department of Environmental Protection to Kingfish Maine, Inc. for an aquaculture operation in Jonesport.  The permit, which the Department issued after conditionally granting Kingfish a wastewater discharge permit for the same project, authorized Kingfish to construct a facility in accordance with the Site Location of Development Law (Site Law), 38 M.R.S. §§ 481 to 489-E (2024), and to install intake and outfall pipes pursuant to the requirements of the Natural Resources Protection Act (NRPA), 38 M.R.S. §§ 480-A to 480-JJ (2024).

2

Petitioners argue that the Board erred in determining the scope of its review under NRPA and by approving the NRPA component of the permit without independently evaluating the environmental impacts associated with the discharge of treated wastewater. We disagree and affirm the judgment.

## I. BACKGROUND

[¶2] The following facts and procedure are derived from the Board's supported findings and the procedural record. *See Sultan Corp. v. Dep't of Env't Prot.*, 2022 ME 21, ¶ 2, 272 A.3d 296; *Martin v. MacMahan*, 2021 ME 62, ¶ 2, 264 A.3d 1224.

[¶3] In 2020, Kingfish began the process of securing permits from the Department to construct and operate a land-based recirculating aquaculture system designed to raise saltwater fish. The project involves the construction of a facility consisting of two primary buildings, access roads, and ancillary buildings. It also involves the installation of two approximately 1,400-foot-long intake pipes to draw water from Chandler Bay and two approximately 2,800-foot-long outfall pipes to discharge treated wastewater into the bay. Kingfish proposed to begin construction of the facility and the pipes upon obtaining all required federal, state, and local permits.

## A.     Agency Proceedings

### 1.     The Discharge Permit

[¶4]  In August 2020, Kingfish applied to the Department for a combined Maine Pollutant Discharge Elimination System Permit and Water Discharge License (the discharge permit) to allow for a daily maximum discharge of 28.7 million gallons of treated wastewater from the proposed aquaculture facility. *See* 38 M.R.S. § 413 (2024).

[¶5]  In June 2021, the Department approved Kingfish's application and issued the discharge permit.  The Department found that the effluent discharge from the facility into Chandler Bay would not lower the quality of any classified body of water below its stated classification or the quality of any unclassified body of water below its anticipated classification.[1]  *See* 38 M.R.S. § 414-A(1)(A), (B) (2024); 38 M.R.S. § 465-B(2) (2020)[2].  In addition, the

---

[1]  Chandler Bay is a Class SB body of water, the "2nd highest classification."  38 M.R.S. § 465-B(2) (2020).  Petitioners do not dispute this fact.

[2]  Section 465-B(2) has recently been amended.  *See* P.L. 2021, ch. 551, § 15 (effective Aug. 8, 2022) (codified at 38 M.R.S. § 465-B(2)(B) (2024)); *see also infra* n.14.  Because this amendment took effect after Kingfish's discharge permit application became complete on August 17, 2020, we cite to the 2020 Maine Revised Statutes, which contain the version of section 465-B(2) that was effective on that date.  *See* 06-096 C.M.R. ch. 2, § 11(F) (effective June 9, 2018) ("Unless otherwise provided by law, all license applications . . . are subject to the substantive laws and rules in effect on the date the application is accepted as complete for processing.").

Several other statutes referenced in this opinion have also been amended recently.  *See, e.g.*, P.L. 2023, ch. 481, § 11 (effective Oct. 25, 2023) (codified at 38 M.R.S. § 480-D(1) (2024)); P.L. 2021, ch. 551, § 7 (effective Aug. 8, 2022) (codified at 38 M.R.S. § 464(4)(F)(2) (2024)).  In each of these other

4

Department found that the effluent discharge associated with Kingfish's project would satisfy various applicable licensing standards, including dilution criteria, 06-096 C.M.R. ch. 530, §§ 2-4 (effective Mar. 21, 2012), dissolved oxygen criteria, 38 M.R.S. § 465-B(2)(B), and temperature criteria, 06-096 C.M.R. ch. 582 (effective May 4, 1996). But the Department found that the effluent discharge would exceed the default threshold for levels of nitrogen concentration and would therefore lower water quality[3] specifically in relation to eelgrass habitat.[4] The Department explained, however, that its finding of an anticipated lowering of water quality "is not a determination that there is toxicity related to the discharge nor . . . a determination that the discharge is in violation of any water quality criterion or standard. Rather, this determination triggers the [State's] antidegradation process in 38 M.R.S. § 464(4)(F)(5)."[5] The

---

instances, we cite the 2024 Maine Revised Statutes because the amendments do not concern the issues on appeal.

[3] A lowering of "the existing quality of any body of water," 38 M.R.S. § 414-A(1)(C) (2024), is statutorily distinct from a lowering of "the quality of any classified body of water below such classification," 38 M.R.S. § 414-A(1)(A).

[4] Without a uniform state or federal threshold for nitrogen concentration, the Department employed a concentration threshold that was consistent with its historical practice and that took into account the proximity of eelgrass to the discharge location.

[5] The State's antidegradation process enables the Department to approve a discharge permit even if the proposed discharge is found to lower water quality. 38 M.R.S. § 464(4)(F); 38 M.R.S. § 414-A(1)(C). For a proposed discharge to qualify for a permit under this policy, the Department must find, following an opportunity for public participation, that the discharge is, among other criteria, "necessary to achieve important economic or social benefits to the State" and that the water body's classification standard is either satisfied or, if it is not satisfied, that this deficiency is not

Department further found that the existing in-stream use of Chandler Bay by the surrounding species and habitat would be maintained and protected. *See* 38 M.R.S. § 464(4)(F)(1-A) (2024).

[¶6] The discharge permit imposes a number of standard and special conditions, including numeric and narrative effluent limitations as well as monitoring requirements. The narrative effluent limitations provide, in part, that Kingfish "must not discharge effluent that contains materials in concentrations or combinations which are hazardous or toxic to aquatic life" and "must not discharge effluent that lowers the quality of any classified body of water below such classification." In addition, Kingfish is subject to ongoing monitoring requirements whereby it must regularly measure and report on water quality, including specifically the nitrogen concentration. The discharge permit expressly provides that the Department may "modify this permit" to require different effluent limits "where there is a reasonable potential that the

---

attributable to the proposed discharge. 38 M.R.S. § 464(4)(F)(3), (5). In applying the policy, the Department can refer on a case-by-case basis to considerations in its non-binding Antidegradation Waste Discharge Program Guidance. *See* Waste Discharge Program Guidance Memorandum from Brian Kavanah, Director, Div. of Water Res. Regul., to Water Licensing & Compliance Staff (June 13, 2001), https://www.maine.gov/dep/bep/2021/12-16-21/TR%20AppB1_MDEP_WW-DEPLW0267 %20-%20antidegradation.pdf [https://perma.cc/T3H2-YSLF]. Such considerations include the project's potential to generate commercial activity, the applicant's ability to comply with effluent limitations, the treatment facility's maintenance, and the feasibility of alternative measures to mitigate the diminution in water quality. *Id.*

6

effluent may cause water quality criteria to be exceeded" or to "change monitoring requirements or limitations based on new information."

[¶7] Petitioners did not appeal the Department's decision to conditionally approve Kingfish's application for the discharge permit. Another interested party, Sierra Club, did appeal the decision, but the Board dismissed the appeal for lack of standing and for failing to comply with the Board's content-related requirements for appeals.

### 2. The NRPA and Site Law Permits

[¶8] In March 2021, Kingfish applied to the Department for a Site Law permit to construct the facility, and also applied for a NRPA permit to install the intake and outfall pipes. A NRPA permit was required because of the potential impacts to freshwater and coastal wetlands from the construction and dredging activities necessary for the pipes to be installed. *See* 38 M.R.S. § 480-C(2)(A), (D).

[¶9] On November 12, 2021, the Department approved Kingfish's application and issued a combined NRPA and Site Law permit with conditions. With respect to the NRPA permit, Kingfish's application satisfied the eleven standards set out in the NRPA statute at 38 M.R.S. § 480-D, including the standard relevant in this appeal, with the Department finding that

[t]he proposed activity will not unreasonably harm any significant wildlife habitat, freshwater wetland plant habitat, threatened or endangered plant habitat, aquatic habitat, travel corridor, freshwater, estuarine, or marine fisheries or other aquatic life provided that the applicant meets the requirements of Findings 6 and 16.[6]

*See* 38 M.R.S. § 480-D(3).

[¶10]  Petitioners timely appealed to the Board.[7]

### 3.      Petitioners' Appeal to the Board

[¶11]  In their written appeal to the Board, Petitioners, in making several arguments, expressed broad concerns about the negative effects of the project on the environment and fishing industries and specific concerns about the effects of effluent on water quality, eelgrass, and other species.  They also asserted that the Department did not receive sufficient data to support its issuance of the NRPA and Site Law permits and requested a public hearing before the Board.

---

[6] In the section of its decision referred to as "Finding 6," the Department found that the pipeline installation would not unreasonably harm neighboring wildlife and fisheries.  Specifically, based on the separately conducted reviews of the Maine Department of Inland Fisheries and Wildlife and the Maine Department of Marine Resources, the Department found that the pipeline construction would not significantly impact nearby wildlife, such as butterfly, lobster, and scallop populations.  Similarly, in the section referred to as "Finding 16," the Department found that Kingfish's proposal would minimize anticipated alterations to freshwater and coastal wetlands and ensure adequate measures to monitor wetland impacts and compensate for negative impacts where necessary.

[7] Although Sierra Club also appealed the issuance of the combined NRPA and Site Law permit to the Board, it is not a party to the present appeal.

[¶12]  On August 4, 2022, the Board held a two-hour meeting at which it heard presentations from Petitioners, Sierra Club, Kingfish, and the Department.  Petitioners renewed their request for a public hearing.

[¶13]  Following the presentations, the Board voted on two items.  First, it voted to deny Petitioners' request for a public hearing for two reasons—because the record created before the Department was sufficient for the Board to make a decision and because Petitioners did not provide a satisfactory offer of proof as to what additional evidence they would present.[8]  *See* 06-096 C.M.R. ch. 2, § 24(A), (B)(4) (effective June 9, 2018).  Next, the Board voted to affirm the Department's order.  The Board subsequently released written findings of fact and conclusions of law supporting its decision to affirm the Department's issuance of the NRPA and Site Law permits.[9]

[¶14]  In its written findings, the Board addressed several issues, including the impacts of Kingfish's project on water quality and neighboring wildlife.  With regard to the impacts on water quality, the Board concluded that

---

[8]  Petitioners, by not raising it here or before the Superior Court, have waived any challenge to the Board's exercise of discretion in declining to conduct another hearing to receive additional public input and evidence.  *See Holland v. Sebunya*, 2000 ME 160, ¶ 9 n.6, 759 A.2d 205.

[9]  In the written decision, the Board found that Petitioners had standing to appeal based on Petitioners' assertion that the project could cause them to suffer "a potential particularized injury to lands [or other property interests] held in ownership" by them.  No party has challenged Petitioners' standing.

the Department did not err in relying on the previously granted discharge permit to determine that Kingfish's project complied with the relevant standards under NRPA, *see* 38 M.R.S. § 480-D(5). The Board reasoned as follows:

> *When the Department reviews water quality impacts under the NRPA in a case in which a [discharge permit] application is being or has separately been evaluated, the focus of the NRPA review is impacts from regulated activities such as dredging, filling, disturbing soil, and placement of structures in, on, over, or adjacent to wetlands and waterbodies.* In this context, the direct discharge of wastewater would be analyzed in the context of the [discharge permit] application review, and *compliance with the NRPA licensing criteria is based on how the project complies with Chapter 310, protecting wetlands and waterbodies, and Chapter 335, protecting significant wildlife and fisheries habitat.*
>
> . . . .
>
> Appellants challenge the findings underlying [the discharge permit] in this appeal of the Site Law and NRPA permit decision, but the Board finds no error in the Department's reliance on another valid Department order, and will not consider a challenge to the findings made in that license in the context of this appeal. . . . The Board finds that [Kingfish] complied with the Department's regulations by submitting evidence of a valid [discharge permit] and on that basis finds that the effluent discharge from the proposed project will not have an unreasonable adverse effect on water quality.

(Emphasis added and footnote omitted.)

[¶15] With respect to the effects of the project on wildlife and fisheries, the Board stated:

> While [Sierra Club and Petitioners] both primarily raise wildlife and fisheries concerns associated with the waste discharge, and issues addressed in that licensing process, some issues they raise are appropriately subject to review under the NRPA or Site Law licensing criteria.

The Board observed that "the Department solicit[ed] comments from sister agencies with subject matter expertise, such as the Department of Marine Resources (DMR) and the Department of Inland Fisheries and Wildlife (MDIFW)." The Board determined that the input from Marine Resources and Inland Fisheries and Wildlife constituted evidence that "supports the Department's findings on the effects of the discharge on fisheries."[10] Specifically with regard to the construction of the intake and outfall pipes, the Board found that modifications agreed to by Kingfish in conjunction with the special conditions ordered by the Department "minimize[] impacts[,] and those impacts that will occur will be temporary and unlikely to cause a significant disturbance to relevant species." The Board concluded:

> On the basis of this evidence, and the DMR comments, the Board finds that the proposed project will not unreasonably harm any

---

[10] The Board stated that "each agency availed themselves of the opportunity to comment on the project and, while MDIFW expressed concerns regarding peatland habitat, and DMR expressed concerns regarding potential for gear entanglement, neither agency expressed any concerns regarding any threatened or endangered species." The Board further credited the Department of Maine Resources comments that the pipeline construction and effluent discharge should have little or no long-term impact on lobster biology or the lobster industry, that the effluent discharge does not appear to threaten the scallop population, and that the proposed project should not result in significant adverse impacts to marine resources.

significant wildlife habitat, freshwater wetland plant habitat, threatened or endangered plant habitat, aquatic or adjacent upland habitat, travel corridor, freshwater, estuarine or marine fisheries or other aquatic life, and will not cause an undue adverse effect on the natural environment.

[¶16]  Petitioners timely appealed to the Superior Court.  *See* M.R. Civ. P. 80C; 5 M.R.S. § 11002(3) (2024).

## B.    Rule 80C Review

[¶17]  In their appeal to the Superior Court, Petitioners challenged the agency's interpretation of its obligations under NRPA and its failure to conduct an independent assessment under NRPA of the unreasonableness of the harm that the project would cause to wildlife habitats.[11]  Petitioners contended that the NRPA standards for assessing impacts on wildlife are distinct from those applicable to the discharge licensing process.

[¶18]   The court determined that the Board had undertaken an independent assessment of the impacts on wildlife associated with the installation of the pipes but not of specific wildlife impacts associated with wastewater discharge.  It nonetheless affirmed the Board's decision, stating

---

[11]  In their Rule 80C petition, Petitioners also contended that the agency's issuance of a NRPA permit was erroneous because the agency failed to assess whether Kingfish adequately complied with its obligation to analyze practicable, less environmentally damaging alternatives to the proposed project.  *See* 06-096 C.M.R. ch. 310, §§ 5(A), 9(A) (effective Nov. 11, 2018).  The Superior Court did not address this issue, and we do not consider it either because it was presented neither to the Board nor to us.  *See Holland*, 2000 ME 160, ¶ 9 n.6, 759 A.2d 205.

that the Board "did not contravene the letter or purpose of NRPA by forgoing an independent analysis of the harms associated with the proposed wastewater discharge and by relying on the findings of the previously issued discharge permit." The court determined that although the Board was not prohibited from considering the impacts on wildlife resulting from the pipes' use, it was not obligated to do so because wastewater discharge is not an activity regulated by NRPA. The court further concluded that the Board's decision to forgo an independent inquiry was reasonable because the impacts of the proposed discharge had been analyzed during the discharge permit approval process, and the standards for assessing impacts on wildlife at each of the two permitting stages were not so divergent as to constitute an error of law.

[¶19] Petitioners timely appealed to us. *See* M.R. App. P. 2B(c)(1); 14 M.R.S. § 1851 (2024).

## II. DISCUSSION

[¶20] As they did in the Superior Court, Petitioners advance two principal arguments here. First, they contend that the Board was required under NRPA to assess the impact on wildlife habitat by the use of the intake and outfall pipes in discharging effluent into Chandler Bay. Second, they argue that the Board abused its discretion by relying on the Department's issuance of the

discharge permit instead of conducting its own independent analysis to determine whether or not the intended use of the pipes to discharge treated wastewater would unreasonably harm wildlife habitat.

## A.  Standard of Review

[¶21]  When the Superior Court acts in its intermediate appellate capacity under M.R. Civ. P. 80C, we review the agency's decision directly.  *Uliano v. Bd. of Env't Prot.*, 2009 ME 89, ¶ 12, 977 A.2d 400.  Because the Board acted as the factfinder and reviewed the legal issues de novo, 06-096 C.M.R. ch. 2, § 24(G) (effective June 9, 2018), it is the Board's decision that we review on appeal, *see Passadumkeag Mountain Friends v. Bd. of Env't Prot.*, 2014 ME 116, ¶¶ 9-10, 102 A.3d 1181; *Concerned Citizens to Save Roxbury v. Bd. of Env't Prot.,* 2011 ME 39, ¶ 17, 15 A.3d 1263.  We review the Board's decision for errors of law, factual findings unsupported by substantial record evidence, or an abuse of discretion. *Forest Ecology Network v. Land Use Regul. Comm'n*, 2012 ME 36, ¶ 28, 39 A.3d 74.

[¶22]  When interpreting a statutory scheme that is "both administered by [an] agency and within the agency's expertise," we apply "a two-part inquiry."  *NextEra Energy Res., LLC v. Me. Pub. Utils. Comm'n*, 2020 ME 34, ¶ 22, 227 A.3d 1117 (quotation marks omitted).  We first determine whether the

statute's language is ambiguous. *Id.* Then if the statute's language is unambiguous, we construe the statute in accordance with its plain meaning. *Id.* If the statute's language is ambiguous, "we defer to the interpretation of a statutory scheme by the agency charged with its implementation as long as the agency's construction is reasonable." *Conservation L. Found., Inc. v. Dep't of Env't Prot.*, 2003 ME 62, ¶ 23, 823 A.2d 551; *see also S.D. Warren Co. v. Bd. of Env't Prot.*, 2005 ME 27, ¶ 4, 868 A.2d 210.

**B.      The Scope of Review under NRPA**

[¶23]  To curtail or eliminate environmental threats posed by alterations to "resources of state significance," 38 M.R.S. § 480-A, NRPA requires a person to obtain a permit before undertaking a specified "activity" when "the activity is located in, on or over any protected natural resource or is located adjacent to . . . [a] coastal wetland,"  38 M.R.S. § 480-C(1)(A).  Section 480-C(2) specifies the "activities" requiring a permit under NRPA:

> **2.  Activities requiring a permit.**  The *following activities* require a permit:
>
> > **A.**  Dredging, bulldozing, removing or displacing soil, sand, vegetation or other materials;
> >
> > **B.**  Draining or otherwise dewatering;
> >
> > **C.**  Filling, including adding sand or other material to a sand dune; or

> **D.** Any construction, repair or alteration of any permanent structure.

*Id.* § 480-C(2) (emphasis added).

[¶24] If an "activity" requires a permit, NRPA provides that the Department "shall grant a permit when it finds that the applicant has demonstrated that the *proposed activity* meets the standards set forth in subsections 1 to 11." 38 M.R.S. § 480-D (emphasis added). Here, the NRPA standard that Petitioners contend the Board failed to properly consider requires that "[t]he activity will not unreasonably harm any significant wildlife habitat, . . . aquatic or adjacent upland habitat, . . . freshwater, estuarine or marine fisheries or other aquatic life." 38 M.R.S. § 480-D(3).

[¶25] Kingfish's proposed installation of intake and outfall pipes requires a NRPA permit because it will involve regulated "activities" listed in section 480-C, including "construction" and "dredging" in a coastal wetland. *See* 38 M.R.S. § 480-C(2)(A), (D). Petitioners do not challenge the Board's evaluation of the impact of these activities. Rather, they assert that NRPA also requires the Board and the Department to analyze the specific effects of the effluent discharge into Chandler Bay.

[¶26] The statute's plain language provides otherwise. The list in section 480-C(2) of "activities" triggering Department review in connection with an application for a permit under NRPA is specific and unambiguous. The statute reflects a clear intention on the part of the Legislature to subject only certain, defined "activities" to review under the NRPA standards in section 480-D(1)-(11). *See Uliano*, 2009 ME 89, ¶ 17, 977 A.2d 400 (holding that the NRPA standards in section 480-D "only appl[y] to the specific activities listed in Section 480-C(2)(A)-(D)"); *Murphy v. Bd. of Env't Prot.,* 615 A.2d 255, 258 (Me. 1992) (noting that NRPA applies to only the particular activities listed in section 480-C(2)). The discharge of treated wastewater through use of the operation's outfall pipes is not a specified activity under section 480-C(2).

[¶27] Petitioners argue that even if the plain language of section 480-C does not expressly provide that the intended use of the facility (and the intake and outfall pipes, specifically) is an activity subject to NRPA review, the use should "factor into the Department's decision about whether to grant a NRPA permit to construct an aquaculture facility" because we have "declined to adopt such a restrictive view of . . . Section 480-C(2)." Petitioners rely on *Hannum v.*

*Bd. of Env't Prot.*, 2006 ME 51, ¶ 10, 898 A.2d 392, in support of this assertion.[12] Their argument is unpersuasive.

[¶28]  In *Hannum*, a trustee of property challenged the Board's denial of a permit under NRPA to install a pier and floating dock on the shore of the property, which was in a coastal wetland.  *Id.* ¶¶ 2-3, 7-8.  The trustee argued that the Board's decision was in error because it was based not only on whether the construction of the dock itself would harm wildlife but also on the Board's determination that the *use* of the dock would "increase boat traffic in the cove which [would] disturb the existing tern and seal colonies."  *Id.* ¶¶ 12-15 (quotation marks omitted).  We affirmed the Board's decision, concluding that "the Board has the power to deny a permit application for a dock based on the dock's use." *Id.* ¶ 14.

[¶29]  To be clear, in *Hannum* we did not say that the agency is *obligated* under NRPA to consider the expected effects on wildlife of the intended use of a structure or facility.  Rather, *Hannum* held that it was within the agency's

---

[12] Petitioners also argue that an interpretation of section 480-C(2) that confines the scope of NRPA review to the specific activities listed is inconsistent with past Department practice of "routinely consider[ing] long-term use when determining whether to issue permits under NRPA."  Because this argument was not raised before either the Board or the Superior Court, we decline to consider it. *Cf. Off. of the Pub. Advoc. v. Pub. Utils. Comm'n*, 2023 ME 77, ¶¶ 27-28, 306 A.3d 633 (concluding that an argument alleging the Public Utilities Commission's failure to create an evidentiary record was waived since it was not raised to the Commission); *Indus. Energy Consumer Grp. v. Pub. Utils. Comm'n*, 2024 ME 60, ¶¶ 28-31, 320 A.3d 437 (declining to review a federal preemption challenge in the absence of a "fully developed administrative record").

discretion to take those impacts into consideration in evaluating compliance with the standard in 38 M.R.S. § 480-D(3). *See id.* ¶¶ 11, 14 ("[W]e will accord deference to the Board's reasonable conclusion that it *may* examine the impact of the use of a structure for which a permit is required along with the impact of the structure itself." (emphasis added)).

[¶30]  The Board, therefore, did not err in focusing its NRPA evaluation in this case on the "activities" listed in section 480-C(2) relating to the installation of the intake and outfall pipes.  It was not required in this instance to assess the impact of the use, as opposed to the installation, of the facility's intake and outfall pipes because, as the Board stated, the impacts of the direct discharge of wastewater "[had] separately been evaluated" by the Department in the context of Kingfish's application for the discharge permit.  Whether the Board's reliance on that prior approval was reasonable and a proper exercise of its discretion is the subject of Petitioners' second principal argument, which we address next.

## C.    The Board's Reliance on the Discharge Permit

[¶31]   Petitioners contend that the Board's decision to rely on the Department's previously issued discharge permit to satisfy NRPA requirements rather than to conduct its own independent analysis was an abuse of discretion.

They argue that the standards for assessing environmental harm in connection with the discharge permit are significantly different from the applicable NRPA standard, and further that the allowance of "economic or social benefits," 38 M.R.S. § 414-A(1)(C), to counterbalance potential water quality degradation in evaluating a discharge permit application renders reliance on those standards unreasonable in the context of reviewing an application for a NRPA permit.

[¶32]  We conclude that the Board did not abuse its discretion in relying on the previously issued discharge permit and that the reliance was reasonable when the Board was determining whether Kingfish's proposed project would not "unreasonably harm any significant wildlife habitat" or "other aquatic life." 38 M.R.S. § 480-D(3).  The discharge licensing process considers impacts on wildlife in two ways.  First, the requirements to obtain a permit focus upon whether a proposed discharge would interfere with a water body's classification,[13] which is a metric that accounts for impacts on marine habitat

---

[13]  The relevant portions of section 414-A require that "[t]he discharge . . . will not lower the quality" of a "classified" or "unclassified" body of water below the relevant classification.  38 M.R.S. § 414-A(1)(A), (B); *see also* 38 M.R.S. § 413(10)(B) (2024) (imposing this requirement in connection with marine aquaculture projects).  Section 414-A also requires effluent limitations, *see* 38 M.R.S. § 414-A(1)(D), and prohibits discharges that lower water quality by any amount at all—even if the water classification remains the same—unless "following opportunity for public participation, the department finds that the discharge is necessary to achieve important economic or social benefits," *id.* § 414-A(1)(C).

20

and wildlife. For instance, Chandler Bay's status as a Class SB water body requires that it be "suitable . . . as habitat for fish and other estuarine and marine life"; that it not receive "[d]ischarges" that "cause adverse impact to estuarine and marine life"; and that it comply with numeric limitations, including standards for dissolved oxygen concentration.[14] *See* 38 M.R.S. § 465-B(2)(A)-(C). Second, the Department must, in deciding whether to issue a discharge permit, find that "the proposed activity would not have a significant impact on" an "existing in-stream use . . . of the water body by a population of plant life, wildlife, or aquatic, estuarine or marine life" or on their respective habitats. *See* 38 M.R.S. § 464(4)(F)(1-A)(a).

[¶33] In granting the discharge permit to Kingfish, the Department examined the effects of the intended discharge from the outfall pipes on wildlife habitat and aquatic life and made findings consistent with these statutory

---

[14] We note that 38 M.R.S. § 465-B(2)(B) was amended to add an introductory sentence that reads, "Class SB waters must be of sufficient quality to support all estuarine and marine species indigenous to those waters without detrimental changes in the resident biological community." P.L. 2021, ch. 551, § 15 (effective Aug. 8, 2022) (codified at 38 M.R.S. § 465-B(2)(B) (2024)). As considered in this case, the amendment is of little consequence because (i) it took effect after Kingfish's completed discharge permit application was filed, *see supra* n.2, and (ii) even if it applied to the circumstances here, the prefatory standard added to subsection (B) ("waters must be of sufficient quality to support all estuarine and marine species indigenous to those waters without detrimental changes in the resident biological community") would essentially overlap with the standard in subsection (C) ("[d]ischarges to Class SB waters may not cause adverse impact to estuarine and marine life in that the receiving waters *must be of sufficient quality to support all estuarine and marine species indigenous to the receiving water without detrimental changes in the resident biological community*"), 38 M.R.S. § 465-B(2)(C) (emphasis added).

requirements. It found that the proposed discharge would not lower the classification status of any water body and that "[e]xisting in-stream water use will be maintained and protected." And, as noted above, the discharge permit includes ongoing sampling and monitoring requirements intended to protect aquatic life and habitat as well as authority for the Department to modify or require different effluent limits "where there is a reasonable potential that the effluent may cause water quality criteria to be exceeded." *See supra* ¶ 6.

[¶34] Finally, contrary to Petitioners' argument, the Board's reliance on the discharge permit in the context of the NRPA review in this instance was not unreasonable because the Department considered the project's economic and social benefits under the State's antidegradation policy. Even when considering economic and social benefits, the Department still cannot issue the permit if it determines that the discharge will "cause or contribute to the failure of the water body to meet the standards of classification." 38 M.R.S. § 464(4)(F)(3). Nor may the Department issue a permit where the discharge "would cause unreasonable degradation of marine waters." 38 M.R.S. § 464(4)(A)(11). And particularly for Chandler Bay, a Class SB water body, any discharge "may not cause adverse impact to estuarine and marine life." 38 M.R.S. § 465-B(2)(C).

[¶35]  Accordingly, the Board did not err in interpreting the scope of review under NRPA or abuse its discretion in relying upon the Department's separate evaluation of impacts of the intended effluent discharge.

The entry is:

Judgment affirmed.

---

Elizabeth A. Boepple, Esq. (orally), Sean R. Turley, Esq., and Ellen P. Masalsky, Esq., Murray, Plumb & Murray, Portland, for appellant Eastern Maine Conservation Initiative and Roque Island Gardner Homestead Corporation

Aaron M. Frey, Attorney General, Robert L. Martin, Asst. Atty. Gen. (orally), and Jack Dafoe, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Board of Environmental Protection

Patrick I. Marass, Esq. (orally), Katherine A. Joyce, Esq., and Rachael McEntee, Esq., Bernstein Shur, Portland, for appellee Kingfish Maine, Inc.

Kennebec County Superior Court docket number AP-2022-33
FOR CLERK REFERENCE ONLY